[No. 6987–0–I. Division One. March 17, 1980.]

MICHAEL MAY, *Appellant,* v. WILLIAM DAFOE, *as Administrator,* ET AL, *Defendants,* AIR SHIELDS, INC., *Respondent.*

*Daniel F. Sullivan,* for appellant.

, *Eric L. Friese, Frank Draper,* and *Detels, Draper & Marinkovich,* for respondent.

JAMES, J.—Michael May sued Air Shields, Inc., for damages based on negligence and strict liability. At the close of

May's case, the trial judge granted Air Shields' motion for a directed verdict. We affirm.

■ A motion for a directed verdict requires that the evidence and all reasonable inferences to be drawn therefrom be viewed most favorably to the nonmovant. *Reiboldt v. Bedient,* 17 Wn. App. 339, 562 P.2d 991 (1977). So viewed, the relevant facts may be fairly summarized as follows.

May was born prematurely in February 1955. Because 23 years had elapsed between the time of his birth and the time of trial, there was no direct testimony concerning May's postnatal care. A nurse who had made one or two entries on his chart did not remember May or his parents. The doctor responsible for the care of May and his mother was deceased. The testimony and evidence relating to May's care was based wholly upon the charts of the hospital.

Premature babies often suffer from respiratory difficulties and asphyxia from lack of oxygen, resulting in brain damage or death. Immediately after birth, May was placed in an Isolette incubator, manufactured by Air Shields, where he remained for at least 3 weeks and during which time he was administered oxygen.

May is legally and permanently blind as a result of glaucoma, a condition caused by retrolental fibroplasia (RLF). Around 1950, it was first recognized that the administration of oxygen to newborn infants was a possible cause of RLF. By 1954, it was generally recognized that the use or nonuse of oxygen, its duration, and its concentration should be determined by clinical necessity, as physicians tried to steer their tiny patients between the Scylla of blindness and the Charybdis of brain damage. However, many practitioners considered the use of oxygen in *concentrations* below 40 percent to be relatively safe.

In September 1954, the preliminary results of a nationwide study of RLF causation were released by the American Academy of Ophthalmology. The *duration* of oxygen therapy was linked with RLF; the *concentration* of oxygen

was ascribed a lesser or an unknown effect. The results, which did not mention the 40 percent oxygen concentration level, were widely and rapidly disseminated within the medical profession.

In September 1954, Air Shields sent an advisory letter to all hospitals using Isolette incubators. It was entitled "*Subject: Oxygen Concentrations and Retrolental Fibroplasia*" and stated in relevant part, "When oxygen is *indicated and prescribed,* maintenance of stable concentrations below 40 per cent will be of paramount importance." (Italics in original.) Exhibit 1. It recommended a mechanical modification to help eliminate inadvertent changes in oxygen concentration. A postscript asked that the letter be routed to the medical and nursing staff. Air Shields' president testified that the letter was prepared and sent as a result of the above mentioned national study but was not intended to be a summary of medical research. There was no evidence that May's doctor was apprised of Air Shields' letter.

May sought damages, alleging that Air Shields' letter was inadequate and misleading because it failed to emphasize that the *duration* and not the *concentration* of oxygen was the critical factor in reducing the possibility of RLF. He contends that Air Shields' failure to provide an adequate warning made it liable under strict liability and negligence.[1] We do not agree.

The doctrine of strict liability does not impose legal responsibility upon a manufacturer simply because harm results from the use of a product. *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975). However, a manufacturer may be held strictly liable for injury sustained by use of a product which is free from defect in

---

[1]Because May's appellate briefs address only strict liability and not negligence, this opinion will not deal with negligence.

either design or manufacture if adequate warning concerning its potentially dangerous propensities is not given a user.

> A product may be faultlessly manufactured and designed, yet still not be reasonably safe when placed in the hands of the ultimate user without first giving an adequate warning concerning the manner in which to safely use the product.

*Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 155, 570 P.2d 438 (1977). *Accord, Haysom v. Coleman Lantern Co.,* 89 Wn.2d 474, 573 P.2d 785 (1978); *Haugen v. Minnesota Mining & Mfg. Co.,* 15 Wn. App. 379, 550 P.2d 71 (1976).

 But the injury received must be the result of a functioning of the product itself. For example, in *Teagle,* the manufacturer knew that its device for measuring the flow of chemical fertilizers could explode if operated at pressures above 50 pounds per square inch. It was held that the failure to warn of the potential danger of explosion rendered the device unsafe and strict liability was imposed for injuries resulting from an explosion.

May was injured because the use of the Isolette permitted his exposure to an excessive amount of oxygen. But the injury he received was not the result of any dangerous propensity of the incubator itself. It was solely a direct and proximate result of a medical decision to administer oxygen.

 We hold that a directed verdict was properly granted. May has not brought to our attention any cases which hold that a manufacturer of mechanical hospital equipment has a duty to warn physicians about the state of current medical research, and our research has not uncovered such a case. We decline to impose such a duty.

Equipment manufacturers need not be trained in medical science; for them to render advice on medical treatment would be suspect and dangerous. Their duty to warn should relate only to design, engineering, and functional dangers.

A fair reading of Air Shields' letter shows its only purpose was to suggest a possible mechanical modification which was desirable in light of the changing needs of the medical profession: that incubators be able to function at low oxygen concentrations. It did not purport to inform physicians about the current state of medical knowledge.

May cites a number of cases pertaining to a drug manufacturer's duty to warn physicians. We conclude that the analogy between a drug manufacturer and an incubator maker is not apt. The dangers associated with a given drug are inherent once a decision is made to use that drug. The same cannot be said about the use of the Isolette. Its use did not compel the use of oxygen. The testimony showed that premature babies were often placed in incubators only for additional warmth and humidity. The use of oxygen and the extent of its use were, in the final analysis, matters within a physician's professional judgment. Furthermore, drug testing and research are an integral part of drug manufacture; an analogous situation does not exist with respect to mechanical hospital equipment and medical research relevant to the use of the equipment.

> Where a product is available only . . . through the services of a physician, the physician acts as a "learned intermediary" between the manufacturer . . . and the patient. It is *his* duty to inform himself of the qualities and characteristics of those products which he . . . uses on his patients, and to exercise an independent judgment, taking into account his knowledge of the patient as well as the product. . . . Thus, if the product is properly labeled and carries the necessary instructions and warnings to fully apprise the physician of the proper procedures for use and the dangers involved, the manufacturer may reasonably assume that the physician will exercise the informed judgment thereby gained in conjunction with his own independent learning, in the best interest of the patient.

(Footnote omitted. Italics ours.) *Terhune v. A.H. Robins Co.*, 90 Wn.2d 9, 14, 577 P.2d 975 (1978).

Affirmed.

CALLOW, C.J., and WILLIAMS, J., concur.

Reconsideration denied April 17, 1980.

Review denied by Supreme Court June 20, 1980.