[No. 7209-6-III. Division Three. August 19, 1986.]

SHERYL E. PARKINS, *Appellant,* v. VAN DOREN SALES, INC., *Respondent.*

*Scott M. Kane* and *Lacy, Kane & Richardson, Inc., P.S.,* for appellant.

*David E. Sonn, Donald L. Dimmitt,* and *Jeffers, Danielson, Sonn & Aylward, P.S.,* for respondent.

MUNSON, J.—Sheryl Parkins brought this products liability action, based upon theories of negligence and strict liability, for injuries received when her arm was crushed in a nip point[1] of a conveyor. In her complaint she alleged the conveyor was defectively designed by Van Doren Sales, Inc., who also failed to warn of the dangerous condition created by the nip point. Van Doren's motion for summary judgment dismissing the action was granted; she appeals. We reverse and remand for trial.

Ms. Parkins was injured on September 1, 1983, when her right arm was caught in a nip point of a conveyor at the Wenoka Fruit Packing Plant in Wenatchee, Washington. At the time of the accident, she was working at a point on the pear processing line where the conveyor belt dropped pears into a discharge chute leading to a pear sizer. Pears rou-

---

[1]A "nip point" or "pinch point" is created where a conveyor belt moves over a stationary object. *See generally* Annot., *Products Liability: Industrial Accidents Involving Conveyor Belts or Systems,* 2 A.L.R.4th 262 (1980).

tinely became wedged in a gap between the edge of the conveyor belt and the end of the chute, causing the conveyor belt to stop moving. Although unclear from the record, apparently part of Ms. Parkins' job as a fruit sorter entailed removing pears which had jammed between the conveyor and the chute.

On this particular occasion, Ms. Parkins reached underneath the conveyor and chute in an attempt to dislodge a pear. As she pulled on the pear, the conveyor belt lurched forward, throwing her hand into a nip point located near the discharge end of the conveyor where the belt fed back over a return idler roller. As a result, Ms. Parkins sustained severe injuries to her right hand, wrist, forearm, and elbow necessitating four subsequent operations.

This conveyor was assembled in the summer of 1981 as one part of a newly installed pear processing line. The processing line was designed by the production manager at Wenoka and constructed and installed by Wenoka personnel. The conveyor was used to link two pear sizing machines. Although Wenoka possessed some of the parts necessary to construct the processing line, it purchased additional parts from Van Doren.

The parts Wenoka purchased from Van Doren in two separate orders included side and end plates, the various rollers, and a pan.[2] Wenoka also purchased from Van Doren other items which were utilized elsewhere in the plant. None of the parts involved here were defectively manufactured. No labels, decals, directions, or instructions warning of the dangerous nip points created when the parts are assembled accompanied the parts; no safety devices or

---

[2]The side plates attach to the pan forming a shallow trough through which the belt is to slide. When the side plates and pan are assembled, they resemble the letter "H". The end plates are then attached to the side plates at the discharge end of the conveyor; the end plates have predrilled holes into which the end rollers and return idler rollers are positioned. The return idler rollers located underneath the pan are designed to prevent slack in the belt. There is a 2–inch gap between the top of the return idler roller and the bottom of the pan through which the belt passes.

guards were included. Instead, Van Doren left it to Wenoka to install guards on the parts or warn its employees of any dangers.

No one from Wenoka consulted Van Doren regarding the assembly, installation, testing, maintenance of the conveyor, or the need for warnings or guards on the conveyor. However, there is an inference that Van Doren knew Wenoka was installing a new pear line in that Wenoka had asked Van Doren where it could purchase the sizing machines.

Van Doren designs and manufactures fruit processing equipment including component parts for a conveyor system, which may be purchased assembled or unassembled. The component parts consist of side plates, a pan (over which the conveyor belt slides), end plates, and the various necessary rollers. Van Doren does not manufacture certain conveyor parts such as the belt, electric motor, or supporting structure. Allegedly, Van Doren's conveyor parts may be assembled only one way.

Wenoka personnel assembled the conveyor, modifying the Van Doren pan slightly. Wenoka built the electric motor used to move the conveyor belt. The belt and discharge chute were purchased by Wenoka from other suppliers. The conveyor system was placed on a supporting structure fabricated by Wenoka personnel.

Conveyors of the type designed and manufactured by Van Doren have existed for over 50 years, virtually unchanged. When it supplies an "assembled" conveyor, Van Doren incorporates guards and warns of potentially dangerous nip points. Van Doren generally does not supply warnings or guards to those who merely purchase unassembled component parts for the conveyors.

On May 1, 1985, Van Doren moved for summary judgment, contending it merely sold Wenoka component parts which were individually nondefective when manufactured; it contended it had no knowledge as to whether the parts would merely be used for replacement purposes or to construct a new conveyor. Consequently, it claimed it owed no

duty to warn or provide safety devices. Ms. Parkins argued Van Doren knew it was selling Wenoka a whole, albeit unassembled, conveyor. She introduced the affidavit of Jack Winsor, a mechanical engineer familiar with conveyors, who stated the conveyor was not safe without guards or warnings.[3]

The court granted Van Doren's motion for summary judgment, dismissing the action. Ms. Parkins moved for reconsideration on June 5, 1985, which motion the court denied. This appeal followed.

## A
### APPLICABILITY OF THE PRODUCT LIABILITY ACT

The product liability act, RCW 7.72, applies since Ms. Parkins was injured on September 1, 1983. A threshold issue is what effect do the act's provisions have on Ms. Parkins' action brought under the common law theories of negligence and strict liability. RCW 7.72.010(4) defines a product liability claim as

> any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product. It includes, but is not limited to, any claim or action previously based on: Strict liability in tort; negligence; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; . . . or other claim or action previously based on any other substantive legal theory . . .

RCW 7.72.030(1)(a), (b), (c), and .030(3) apply in this case. RCW 7.72.030(2), "subject to strict liability" does not apply.[4] Ms. Parkins is a claimant entitled to bring a pro-

---

[3]Van Doren argues that a second affidavit of Mr. Winsor submitted to the court after it had entered its formal order of summary judgment, but before Ms. Parkins moved for reconsideration, cannot properly be considered. We disagree, although his first affidavit considered by the court before rendering summary judgment is sufficient, alone, to indicate material issues of fact.

[4]RCW 7.72.030 provides:

ducts liability action for purposes of the act, *i.e.,* one who suffered harm. RCW 7.72.010(5).

RCW 7.72.010(2) provides that a manufacturer "includes a product seller who designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer." Van Doren contends it "had nothing whatsoever to do with the design, construction, installation, testing or maintenance of the conveyor." The trial court agreed and granted summary judgment.

This conclusion, however, mischaracterizes Van Doren's role in the design, manufacture, and distribution process

---

"Liability of manufacturers. (1) A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed . . .

"(a) A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product.

"(b) A product is not reasonably safe because adequate warnings or instructions were not provided with the product, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate.

"(c) A product is not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured where a manufacturer learned or where a reasonably prudent manufacturer should have learned about a danger connected with the product after it was manufactured. In such a case, the manufacturer is under a duty to act with regard to issuing warnings or instructions concerning the danger in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances. This duty is satisfied if the manufacturer exercises reasonable care to inform product users.

"(2) A product manufacturer is subject to strict liability to a claimant if the claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction or not reasonably safe because it did not conform to the manufacturer's express warranty or to the implied warranties under Title 62A RCW.

". . .

"(3) In determining whether a product was not reasonably safe under this section, the trier of fact shall consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer."

relevant here. While it did not design, construct, or install the *pear processing line,* it did design and manufacture the component parts used and installed without substantial modification in assembling the conveyor. It is the design, and subsequent injury because of that design, which form the basis of Ms. Parkins' claim, *i.e.,* the conveyor parts were designed to be assembled in one unique way and because that design did not incorporate guards or warnings, it is not reasonably safe. Van Doren is a product manufacturer within the provisions of the act.

Because Ms. Parkins was injured by machinery purchased from Van Doren, as opposed to other equipment which made up the pear processing unit, those parts constitute "relevant" products for the purposes of the act. RCW 7.72.010(3). Therefore, the provisions of the act apply to this action.

## B
### DEFECTIVE DESIGN BECAUSE OF LACK OF SAFETY DEVICES

Ms. Parkins contends the conveyor was defectively designed because Van Doren failed to supply safety devices or at least include predrilled holes in the parts so the purchaser could easily install its own guards. RCW 7.72-.030(1)(a) and .030(3).

Reading RCW 7.72.030(1)(a) and .030(3) together, the claimant must prove the injury–causing product was not reasonably safe by virtue of the manufacturer's negligent choice of product design. A design choice is negligent if the product is not reasonably safe because the manufacturer failed to take reasonable steps to eliminate or lessen any danger arising from such design. The focus is not simply on the product itself; rather, the focus is primarily on the manufacturer's weighing of the design's dangers against its benefits. The trier of fact analyzes the actual design choice using the factors provided in RCW 7.72.030(1)(a). The likelihood and seriousness of harm from the product as designed is balanced against the burden on the manufac-

turer to design a safer product and the adverse effects, if any, that a safer design would have on the product's usefulness. The design choice is examined in light of the knowledge which the manufacturer possessed as of the date of manufacture, rather than trial. RCW 7.72.030(1)(a).

Here, in considering the evidence and all inferences therefrom in favor of Ms. Parkins as the nonmoving party, we conclude two genuine issues of material fact exist. The first issue is whether these parts, when assembled without guards, were reasonably safe. The affidavit of Roy Proctor, a mechanic of fruit packing equipment, indicates the likelihood of industrial accidents involving unguarded nip points is relatively high. Jack Winsor's first affidavit indicates the cost to Van Doren of including a guard would have been low. The evidence indicated Van Doren routinely supplied such guards when it installed and assembled its conveyors. No evidence was introduced to the effect that a guard over the return idler rollers was unavailable or would adversely impact the usefulness of the conveyor.

The evidence also indicates that at the time of manufacture, Van Doren knew unguarded nip points made its conveyors "not reasonably safe": (1) Mr. Proctor's affidavit stated the danger of unguarded nip points is recognized in the industry and could be guarded against; (2) this conveyor was originally designed 20 years before the accident, remaining virtually unchanged; and (3) Van Doren routinely placed such guards on nip points when it installed the conveyors. Based on this evidence, a jury could find that Van Doren should have recognized the risk of designing and supplying conveyor parts without guards for nip points.

The second issue is whether Van Doren knew at the time of sale that the parts bought by Wenoka were going to be used to construct a complete conveyor. There is an indication Van Doren knew Wenoka was installing a new processing line and required equipment like conveyors and sizers. The parts ordered from Van Doren, as described in the invoices, indicate Wenoka was purchasing the compo-

nent parts for assembly of a conveyor; although the invoices contain over 48 separate items, many unrelated to the conveyor, almost all the major items relate to a conveyor assembly.

Van Doren argues, however, that even if it possessed such knowledge, it was not feasible to provide guards since they had no control over the assembly. We disagree. While the conveyor parts may be individually ordered, the basic design of the conveyor never changes, no matter who assembles the parts. The type of nip point that injured Ms. Parkins is *always* created in proximity to the end plates as this is where the belt threads back through a roller. In this regard, Mr. Winsor compared a conveyor assembled by Van Doren at another packing plant with the one assembled at Wenoka, concluding

> *their design was virtually identical . . . This equipment fits together in a unique manner,* making it virtually impossible to distinguish which if any equipment was assembled by Wenoka or Van Doren. . . .
>
> . . .
>
> . . . [F]rom reviewing the photographs of both the Wenoka and Welch facilities, *the design of the conveyors in question are virtually identical.*

(Italics ours.)

Ms. Parkins also contends the trial court erred in granting summary judgment because the conveyor was dangerously defective given that no warning labels, decals, signs, or other instructions were provided on the end plates near the nip points. RCW 7.72.030(1)(b). We agree.

Because material issues of fact exist, we conclude the trial court erred in granting summary judgment for Van Doren.

## C
### AFFIRMATIVE DEFENSES

Van Doren also argues it was entitled to a judgment as a matter of law based on two affirmative defenses. Although these defenses have tangentially been discussed previously, we briefly comment on them again for clarity and to aid the

trial court on remand. The act does not cover defenses; the following analysis is governed primarily by current Washington decisions. *See* Washington State Senate Select Comm. on Tort & Prod. Liab. Reform, *Final Report 1981,* at 33.

### 1. Substantial Change

■ Van Doren contends the component parts underwent a substantial change after being purchased by Wenoka. A user or consumer may be barred from recovery if the product undergoes substantial change in its condition after leaving the manufacturer. *Padron v. Goodyear Tire & Rubber Co.,* 34 Wn. App. 473, 476, 662 P.2d 67, *review denied,* 100 Wn.2d 1003 (1983); *Bich v. General Elec. Co.,* 27 Wn. App. 25, 29, 614 P.2d 1323, 10 A.L.R.4th 842 (1980) (citing Restatement (Second) of Torts § 402A(1)(b), and comment *p* (1965)). Although the substantial change defense arose with respect to claims brought under section 402A strict liability, that defense appears equally applicable to claims brought under the act for alleged negligent product designs and negligent failure to warn. Here, although Wenoka added the conveyor belt, motor, and supporting braces, there is evidence these parts had to be added to construct any conveyor. Likewise, Wenoka's modification of the pan was not significant from a design viewpoint and does not constitute a substantial modification. *See Soler v. Castmaster, Div. of H.P.M. Corp.,* 98 N.J. 137, 484 A.2d 1225, 1230 (1984).

### 2. Superseding Proximate Cause

■ Van Doren also argues it should not be held liable for failure to add guards or warnings when none were requested by Wenoka. The essence of this argument is that Van Doren was relieved of any responsibility because Wenoka knew the equipment was dangerous. Thus, Van Doren argues Wenoka's failure to add such devices was a superseding intervening cause of Ms. Parkins' injury.

The intervening negligent act of another will not supersede the original actor's negligence as a proximate cause of

an injury where the original actor should reasonably foresee the occurrence of such an event. *Smith v. Acme Paving Co.,* 16 Wn. App. 389, 396, 558 P.2d 811 (1976). Only when the intervening negligence is so highly extraordinary or unexpected that it falls outside the realm of reasonable foreseeability will it be held to supersede a defendant's negligence. *Little v. PPG Indus., Inc.,* 19 Wn. App. 812, 825, 579 P.2d 940 (1978), *aff'd as modified,* 92 Wn.2d 118, 594 P.2d 911 (1979).

Here, Wenoka's failure to install warnings and other safety devices is not unforeseeable. *See Pust v. Union Supply Co.,* 38 Colo. App. 435, 561 P.2d 355 (1976), *aff'd,* 196 Colo. 162, 583 P.2d 276, 2 A.L.R.4th 245 (1978); *Finnegan v. Havir Mfg. Corp.,* 60 N.J. 413, 290 A.2d 286, 291–92 (1972). *See generally* Annot., *Products Liability: Manufacturer's or Seller's Obligation To Supply or Recommend Available Safety Accessories in Connection With Industrial Machinery or Equipment,* 99 A.L.R.3d 693 (1980). We conclude the causal chain between Van Doren's initial acts and Ms. Parkins' injury was not broken.

Therefore, we conclude Van Doren is not entitled to a summary judgment as genuine issues of material fact exist and Van Doren has failed to present any affirmative defenses which bar Ms. Parkins'·claim as a matter of law.

We reverse and remand.

GREEN, C.J., and MCINTURFF, J., concur.