[No. 29123-1-II. Division Two. January 13, 2004.]

TAURINO SEPULVEDA-ESQUIVEL, *Appellant*, v. CENTRAL MACHINE WORKS, INC., ET AL., *Respondents*.

*James D. Horton* (of *Blair, Schaefer, Hutchison & Wolfe, L.L.P.*) (*Mary Ellen Page Farr*, of counsel), for appellant.

*Leigh D. Erie* (of *Gierke Curwen Metzler & Erie*); *Robert E. Sabido* and *Thomas W. Brown* (of *Cosgrave Vergeer Kester, L.L.P.*); *William R. Hickman* (of *Reed McClure*); and *Heather Shand Perkins* (of *Oles Morrison Rinker & Baker, L.L.P.*), for respondents.

BRIDGEWATER, J. — Taurino Sepulveda-Esquivel (Sepulveda) appeals from a summary judgment dismissing his product liability claims under the Washington product liability act (WPLA). Sepulveda was injured when a load fell from a hook that had been modified by Vanalco, his employer, forged by Ulven Forging, Inc. (Ulven), and supplied to Vanalco by Central Machine Works, Inc. (Central). Since the hook did not fail, the hook is not a "relevant product" which would give rise to the product liability claim. Because neither Ulven nor Central designed the hook, knew of the use Vanalco was to make of the hook, or modified the hook, neither Ulven nor Central was a "product seller" or a "manufacturer" under the WPLA. We affirm.

## I. The Underlying Injury

On October 31, 1997, Sepulveda suffered serious injuries when a piece of machinery fell on him at his place of work at the Vanalco aluminum reduction plant in Vancouver, Washington: a "bridge" secured to a crane by a "hook" fell when the crane operator lifted the bridge from a "pot." Clerk's Papers (CP) at 101. A pot is a large machine used in the smelting of aluminum. It is approximately 10 feet tall, 18 feet long, and 3 feet wide. During part of the smelting process, a bridge is placed on top of and around the top portion of a pot using an overhead crane and hook. The

bridge is approximately 3 feet high, 18 feet long, and 3 1/2 feet wide. Welded to the bridge's top is a bail—a bar that looks like an inverted "V," under which the hook is placed to pick up and move the bridge. CP at 49. A metal latch (a "mouse") goes over the hook's mouth after the bail is in the hook. The mouse is secured to the hook by a "T" bolt, which is tightened by hand. CP at 52. The mouse fits around the outside of the tip, across the mouth, and around the upper back spine of the hook.

Once all those things are in place, a crane operator lifts the bridge and places it on top of a pot. The bridge connects and secures to the pot through an air pressure hose system. After the bridge performs its task on the pot, a carbon setter disengages the air hose, and the crane operator lifts the bridge off the pot, moves it over the catwalk between the pots, and sits it down on the next pot. Vanalco employees knew that things being carried on the hook, including bridges, would come off the hook.[1]

Sepulveda was a carbon setter working for Vanalco. Am. Br. of Appellant at 11. On the day of the injury, Sepulveda stood on the steps adjacent to the pots while the crane moved the bridge. The smelter area was hot and loud, and the workers relied on body language to communicate. Sepulveda saw the bridge move from pot 64 and come to rest on pot 65. Sepulveda looked at the crane operator and saw him move his foot, look around, and sit back, so Sepulveda thought the crane operator was done moving the bridge. The cable holding the bridge was also loose, indicating that the bridge was in place. The hook was still attached to the bridge. The mouse was still affixed to the hook.

Thinking the crane operator had finished moving the bridge, Sepulveda went onto the catwalk between pots 64 and 65 toward the clamps to adjust some machinery. An air hose attaches to the bridge when it is in place on the pots

---

[1] Vanalco's standard operating procedures and safety rules required employees not to stand on the catwalk between the pots until the bridge was stable on the pot. Sepulveda knew the safety policies. If an employee failed to comply with safety requirements, Vanalco took disciplinary action against the employee, including possible termination of employment.

and is disconnected when the bridge moves. The hose had been disconnected after the bridge was moved from pot 64 and had not yet been reconnected to pot 65. Apparently, when the hose was not reconnected, the crane operator thought the bridge was not properly placed and lifted the bridge off pot 65 to adjust its seating. The hook came loose from the bridge, and the 2500-pound bridge fell on Sepulveda, pinning him to the superheated metal catwalk and pot, causing serious injuries.

## II. Creating the Hook and Mouse

The issues here turn, in part, on who designed the product that injured Sepulveda. The parties agree that Vanalco provided the mouse; Vanalco is not a party here.

The earliest information about the hook is a 1954 Alcoa drawing. Over the years, changes were made to the hook, which were indicated on the hook's engineering drawing. In 1988, the capacity of the hook was changed from six to seven tons. Changes were also made to the radius on the tip of the hook. The hook was not designed or constructed with a latch to close the mouth of the hook or with a mechanism to attach such a latch and, for the two years before the accident, Vanalco used an external mouse to close the hook's mouth.

Alcoa supplied plans to Sowa & Sons to produce a die to forge the hook. CP at 440-41. At least from the late 1960s or 1970s until about 1983, Vanalco or Alcoa ordered hooks from Sowa & Sons. Sowa & Sons went into Chapter 11 bankruptcy in about 1983 and was purchased by Kaiser Aerospace and Electronics. In 1986, Kaiser auctioned off some of the division's forging dies. Ulven bought several of those dies, including the die for the hook at issue here. That die was not used between 1986 and 1992.

Vanalco purchased the aluminum plant from Alcoa in 1987. The sale included a majority of the plant's inventory and equipment, including the design for the hook. In the early 1990s, Vanalco ordered hooks from Central. In doing

that, Vanalco's purchasing department would send a facsimile to Central, requesting a quote for "7 TON DIE FORGED CRANE HOOK PER [drawing] A-700183 . . . No. 13"—a drawing that Vanalco provided to Central. CP at 36. Vanalco was Central's sole customer for the hook, and Central was Ulven's sole customer for the hook.

Vanalco had contacted Paul Sowa, who was with Sowa & Sons when the die was cast and with Central by this time; Vanalco asked him to produce the hook for Vanalco. Central sent a drawing of the hook and requested a bid. Central contacted Ulven, who had the die for these hooks. Central outsourced forging to Ulven because Central did not have the capacity to forge the hook.

In forging the hook, Ulven heated steel until it was malleable; put the malleable steel into the die; then hammered the two die plates together with a large machine to fill out the mold in the die. During this process, some of the steel squished out of the mold and created an edge ("flash"), which Ulven burned off. CP at 149. Ulven then reheated the rough hook to normalize it.

After Ulven performed that work, Central performed finishing work on the rough hook. Specifically, Central ground the remaining flash and drilled an eyehole at the top of the hook, where it would attach to a crane. Finally, Central sent the hook to F&F Grinding, which performed fine grinding on the two sides of the eyehole. When this process was complete, Central delivered the hook to Vanalco, which attached the mouse onto the hook. The hook that injured Sepulveda was placed on the crane on August 20, 1997.

Several factors are readily apparent and important to our consideration:

(1) Alcoa, not Ulven, or Central designed the hook;

(2) The hook did not break, shatter, or fail to bear its load;

(3) Neither Ulven nor Central knew how Vanalco was going to use the hook, except for the load it would bear;

(4) Vanalco never asked for or specified any type of latching mechanism for the hook;

(5) Neither Ulven nor Central designed the "mouse," made the "mouse," or attached it to the hook;

(6) Vanalco used the hook for transporting large crucibles of molten aluminum where a latching mechanism on the hook would have been inappropriate; and

(7) Vanalco manufactured the "mouse" and attached it; it was then hand-tightened whenever used.

## ANALYSIS

### I. Standard of Review on Summary Judgment

Sepulveda is appealing the grant of summary judgment dismissal to Central and Ulven. When reviewing an order of summary judgment, the appellate court engages in the same inquiry as the trial court. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c). The court must consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. *Wilson,* 98 Wn.2d at 437. The nonmoving party may not rely on speculation, argumentative assertions that unresolved factual issues remain, or on having its affidavits considered at face value. *Seven Gables Corp. v. MGM/UA Entm't Co.,* 106 Wn.2d 1, 13, 721 P.2d 1 (1986). After the moving party has submitted adequate affidavits, the burden shifts to the nonmoving party to set forth specific facts sufficiently rebutting the moving party's contentions and disclosing the existence of a material issue of fact. *Seven Gables,* 106 Wn.2d at 13. The court should grant the motion only if, from all the evidence, reasonable persons could reach but one conclusion. *Wilson,* 98 Wn.2d at 437.

## II. Manufacturer v. Product Seller: the Relevant Product

Sepulveda contends that Central and Ulven are liable under the WPLA as either "manufacturers" or "product sellers." The definition of a manufacturer is, in relevant part: "a product seller who designs, produces, makes, fabricates, constructs, or remanufactures the *relevant product or component part of a product* before its sale to a user or consumer." RCW 7.72.010(2) (emphasis added). A product seller is, in relevant part: "any person or entity that is engaged in the business of selling products, whether the sale is for resale, or for use or consumption. The term includes a manufacturer, wholesaler, distributor, or retailer of *the relevant product.*" RCW 7.72.010(1) (emphasis added). The "relevant product" under this chapter is that product or its component part or parts that gave rise to the product liability claim. RCW 7.72.010(3).

### A. The Mouse

Neither Central nor Ulven is either a "manufacturer" or "product seller" of the mouse since Vanalco designed and manufactured it.

### B. The Hook and Mouse Assembly

■ If we consider the entire assembly as a unit and inquire whether there was liability as a component manufacturer or supplier, the "relevant product" is the component if the component gave rise to the product liability claim. *Parkins v. Van Doren Sales, Inc.*, 45 Wn. App. 19, 24-25, 724 P.2d 389 (1986). The court held in *Parkins*:

> While it did not design, construct, or install the *pear processing line*, it did design and manufacture the component parts used and installed without substantial modification in assembling the conveyor. It is the design, and subsequent injury because of that design, which form the basis of Ms. Parkins' claim, *i.e.*, the conveyor parts were designed to be assembled in one unique way and because that design did not incorporate guards or

warnings, it is not reasonably safe. Van Doren is a product manufacturer within the provisions of the act.

Because Ms. Parkins was injured by machinery purchased from Van Doren, as opposed to other equipment which made up the pear processing unit, those parts constitute "relevant" products for the purposes of the act. RCW 7.72.010(3). Therefore, the provisions of the act apply to this action.

*Parkins*, 45 Wn. App. at 25.

In this case, neither Central nor Ulven made, supplied, or sold the finished, completed hook assembly with the mouse. Neither Central nor Ulven was asked to design, forge, make, or sell an interior, locking device on its hook. Because there was no defect in the hook itself, Ulven is without fault; Central is without fault because it did not design the hook and merely provided the hook according to the purchaser's specifications, including the lack of a closing device. Like the trial court, we see no duty in either Central or Ulven to overrule Vanalco's determination to use such hooks in multiple ways, some with and some without latching devices.

In order to even approach the level of liability Sepulveda urges, under the WPLA, presupposes that either Central or Ulven knew of the hook's use and that they would perform some level of engineering to examine the design that they were furnished. Under the common law, component sellers are not liable when the component itself is not defective. As Ulven points out: "This would require the component seller to develop sufficient sophistication to review the decisions of the business entity that is already charged with responsibility for the integrated product. *See* RESTATEMENT (THIRD) OF TORTS § 5 cmt. a (1998)." Br. of Resp't at 27.

Thus, Sepulveda cannot demonstrate that the hook or the assembly of the hook with the mouse was a relevant product under the WPLA. That being so, neither Central

nor Ulven is either a manufacturer or a product seller.[2] There is no liability; and there was no error by the trial court. Summary judgment was appropriate.

Affirmed.

MORGAN and ARMSTRONG, JJ., concur.

---

[2] We do not address the other defenses raised by the parties because the product must be a "relevant product" before there can be liability. That issue is determinative.