# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JOHN O'CONNELL, | No. 49161-3-II |
| Appellant, | |
| v. | |
| MACNEIL WASH SYSTEMS LIMITED, a Canadian designing and manufacturing company doing business in Thurston County, Washington, | UNPUBLISHED OPINION |
| Respondent, | |
| And | |
| AUTO WASH SYSTEMS LLC, a Washington limited liability company; CHARTER INDUSTRIAL SUPPLY, LLC, a Washington limited liability company; PATRICK HARRON & ASSOCIATES, LLC, a Washington limited liability company; ANDERSON BOONE ARCHITECTS, PS, a Washington professional service company; KAREN BOWMAN and "JOHN DOE" BOWMAN, and their marital community; and DOE CORPORATIONS 1 through 3; Jointly and Severally, | |
| Defendants. | |

BJORGEN, C.J. — MacNeil Wash Systems Limited (MacNeil) sold John O'Connell a car

wash system, which did not include safety bollards at the entrance of the car wash. O'Connell

was injured when a customer lost control of her vehicle and drove into him at the car wash

entrance. O'Connell sued MacNeil under the Products Liability Act, chapter 7.72 RCW (Act), and the superior court granted MacNeil's motion for summary judgment on all claims.

O'Connell appeals, arguing that the trial court erred in dismissing his claims because he created genuine issues of fact as to (1) whether MacNeil was a product manufacturer or seller of a relevant product, namely a car wash system and (2) whether that car wash system was unreasonably safe (a) because of its design, which failed to include a safety bollard at the entrance of the car wash or (b) because it lacked a warning that the equipment would not protect against this type of harm.

We hold that O'Connell raises genuine issues of material fact and the trial court erred in granting summary judgment to MacNeil. Accordingly, we reverse and remand.

FACTS

O'Connell desired to start a car wash business. In his research, he read on MacNeil's website that it was "the largest, most trusted, dependable car wash equipment people in the world." Clerk's Papers (CP) at 536-37. O'Connell contacted a representative from Auto Wash Systems LLC (Auto Wash), MacNeil's independent distributor, who coordinated and facilitated the sale of a car wash system to O'Connell. The Auto Wash representative told O'Connell that MacNeil was "the Cadillac of car wash systems." *See* CP at 166. O'Connell took no part in selecting specific equipment for the car wash. Auto Wash told O'Connell what MacNeil equipment he would need to operate his car wash.

Although not clear from the record, it appears that O'Connell hired an architect to draw up plans for a car wash building, and then submitted those plans to Auto Wash, which in turn gave them to MacNeil. MacNeil does not design the buildings that house its equipment.

2

MacNeil prepared an estimate of all the required parts for O'Connell to start his car wash, the total cost of which was approximately $478,000. Included in that estimate were parts for a vehicle conveyor and for a correlator, which served as the "entry guide onto [the] conveyor." CP at 112. A MacNeil representative told O'Connell that the correlator "would guide vehicles safely" onto the conveyor and wash platform. *See* CP at 534-35. MacNeil did not include protective bollards in the equipment package.

MacNeil also prepared drawings showing how the car wash equipment should be organized and installed in the proposed building housing the car wash. If the building and equipment package do not work together, MacNeil requires that the purchaser's architect draw up new building plans that will work with its equipment.

After O'Connell approved MacNeil's proposed drawings, MacNeil prepared additional "shop drawings" to assist the subcontractors in building and installing the car wash equipment. O'Connell's car wash was built according to the drawings prepared by MacNeil. Auto Wash installed the MacNeil car wash equipment, and MacNeil's vice president of sales in the Western Region was on the premises during the construction and installation. O'Connell's car wash, "Go Green," opened for business in February 2010.

On October 8, 2011, O'Connell stood near the correlator and conveyor, while directing customer Karen Bowman into the car wash. The correlator was working properly. During this process, Bowman felt the vehicle's wheels go "up," causing her to step on the accelerator. Her vehicle accelerated off the correlator and struck O'Connell, severely injuring him.

MacNeil's equipment manual did not warn that the correlator-conveyor equipment would not protect others from suddenly accelerating vehicles and did not recommend the use of bollards

to protect from such a risk. After his injury, O'Connell installed bollards, costing about $1,000 for labor and materials, in front of the place where he had been standing to prevent further similar incidents.

O'Connell sued MacNeil under the Act, alleging that MacNeil was not only the manufacturer of the parts for the car wash, but also that it was the designer of it. O'Connell contended that MacNeil's failure in its design to include bollards at the entrance of the car wash and its failure to warn that the correlator-conveyor would not prevent vehicles from striking him made it liable under the Act.

MacNeil moved for summary judgment on O'Connell's claims. In opposition, O'Connell submitted the declaration of Gary Sloan, a "forensic human factors" specialist.[1] CP at 173. After conducting an investigation of the incident, Sloan opined in pertinent part:

> Exhibit L shows frames . . . grabbed from the videos that were taken at the time of the incident. The time spanning these two events was about 0.67 seconds . . . [when] the Kia's left front tire struck the conveyor guide rail at an angle when it was about halfway across the second correlator. It follows that 1) the correlators failed to align the vehicle's front tires with the conveyor; 2) the guide rail did not provide an adequate barrier with respect to guarding Mr. O'Connell from exposure to the hazard, and 3) there was little time for Mr. O'Connell to appreciate the danger and respond to it in time to avoid harm.

CP at 177.

---

[1] According to Sloan's declaration:
> Human Factors seeks to reduce accidents and improve efficiency by researching and applying information about human physical, physiological, and psychological characteristics and limitations to the design and operation of equipment, settings, and consumer products. From the perspective of my discipline, if an incident having negative consequences is predictable, then reasonable precautions should be taken to reduce the likelihood of its occurrence and the severity of its negative consequences.

CP at 174.

As shown in Exhibit N, the initial physical interface between vehicles entering the Go Green Car Wash and MacNeil equipment consisted of the [correlators] and, potentially, the conveyor guide rails. Yet, in the MacNeil operator manual for these components, there is no mention of the danger posed by approaching vehicles at this interface or what can be done to mitigate risk.

CP at 178.

I have systematically explored a wide range of different trajectories for a vehicle intruding into the area occupied by Mr. O'Connell. . . . [A] bollard could have been provided that would have offered protection to Mr. O'Connell over a wide range of vehicle trajectories.

CP at 180.

The cost of bollards and their installation is nominal relative to other system costs. . . . If properly configured, bollards do not interfere with the ability of operators to perform their tasks.

CP at 181.

The trial court denied MacNeil's summary judgment motion. However, it allowed MacNeil to file another summary judgment motion after more discovery was conducted, particularly on the question of car wash industry standards in regard to safety.

MacNeil renewed its motion for summary judgment and attached the declaration of Harvey Miller, a car wash systems consultant. Relying on his own investigation and personal knowledge, Miller opined that "[s]afety bollards at the entrance of tunnel car washes are not and have never been industry standard." CP at 277.

In opposing MacNeil's renewed summary judgment motion, O'Connell filed an additional declaration by Sloan, which opined, in pertinent part, that "[b]ollards are being used in some car washes to protect employees who guide customers onto the conveyor." CP at 442. In

support, Sloan relied on an article by Anthony Analetto, which stated that "Bollards Equal

Safety" in part because "[a]ttendants stand safely behind the post as they guide customers onto

the conveyor." CP at 443. Analetto is the equipment division president of Sonny's Car Wash

Factory, the largest manufacturer of "conveyorized" car wash equipment in the world. CP at

443, 506. Also to support his opinion, Sloan referred to a 2006 press release from the

International Car Wash Association, which stated that there had recently been accidents

involving vehicles which suddenly accelerate and injure car wash attendants.

Along with his previous observations, Sloan concluded that:

MacNeil . . . knew, or should have known, that sudden, unintended accelerations of vehicles at the entrance to car washes due to either vehicular malfunctions or operator error posed a danger to attendants guiding vehicles onto the conveyor.

CP at 444.

On the matter of warnings, Sloan stated:

From the perspective of safety, the issue is not whether the correlator/guide rail were defective in terms of their intended function *but whether MacNeil could reasonably anticipate that these components were insufficient to prevent an entering vehicle from intruding into the area occupied by the worker*.

MacNeil Wash Systems Limited should have warned John O'Connell about the risk of vehicles jumping over the guide rail due to sudden unintended accelerations and recommended the inclusion of one or more bollards (or other means of guarding) near the entrance to the car washes for attendants to stand behind when guiding vehicles onto the conveyor.

CP at 446 (emphasis added).

The trial court granted MacNeil's renewed motion for summary judgment, stating:

1. That the equipment manufactured by MacNeil was not defective and that Plaintiff was not injured by MacNeil equipment.

2. That bollards are not industry standard in tunnel car washes and that it is not customary or standard for car wash equipment manufacturers to recommend, manufacture[] or install bollards at car washing.

CP at 551.

O'Connell appeals.

## ANALYSIS

### I.  STANDARD OF REVIEW

We review an order granting summary judgment de novo, performing the same inquiry as the trial court.  *Nichols v. Peterson NW, Inc.*, 197 Wn. App. 491, 498, 389 P.3d 617 (2016).  In doing so, we view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from the evidence in that party's favor.  *Id.*  "A party moving for summary judgment bears the initial burden of showing the absence of an issue of material fact" and its entitlement to judgment as a matter of law.  *Id.* (quoting *Kofmehl v. Baseline Lake*, *LLC*, 177 Wn.2d 584, 594, 305 P.3d 230 (2013)); CR 56(c).  "If this burden is satisfied, the nonmoving party must present evidence demonstrating [a genuine issue of] material fact."  *Walston v. Boeing Co.*, 181 Wn.2d 391, 395-96, 334 P.3d 519 (2014).  "Summary judgment is appropriate if the nonmoving party fails to do so."  *Id.* at 396.

### II.  PRODUCT SELLER/MANUFACTURER OF A RELEVANT PRODUCT

O'Connell argues that he has created a genuine issue of fact as to whether MacNeil is either a "product seller" or "manufacturer" of the "relevant product" under the Act.  Br. of Appellant at 6.  We agree.

Under RCW 7.72.030(1),

> [a] product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided.

Thus, in general, a plaintiff must show that (1) a manufacturer's product (2) was not reasonably safe because of its design or because of lack of adequate warnings or instructions, which (3) caused harm to the plaintiff.[2] *See Ayers By & Through Ayers v. Johnson & Johnson Baby Prods. Co., a Subsidiary of Johnson & Johnson Co.*, 117 Wn.2d 747, 752, 818 P.2d 1337 (1991); *see Thongchoom v. Graco Children's Prods., Inc.*, 117 Wn. App. 299, 304, 71 P.3d 214 (2003).

"'Manufacturer' includes a product seller who designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer." RCW 7.72.010(2). "Product seller" in turn means

> any person or entity that is engaged in the business of selling products, whether the sale is for resale, or for use or consumption. The term includes a manufacturer, wholesaler, distributor, or retailer of the relevant product.

RCW 7.72.010(1). "Product" means

> any object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce. . .

---

[2] MacNeil asserts in conclusory fashion that Bowman, the vehicle's driver, not MacNeil, caused O'Connell's injuries. However, MacNeil fails to provide a proximate cause analysis. Instead, MacNeil argues that it did not sell a "relevant product" to O'Connell, and even if it did, it was not unreasonably safe. Br. of Resp't at 12. Given this, we will not sua sponte undertake a proximate cause analysis. *See* RAP 10.3(a)(6).

> The "relevant product" under this chapter is that product or its component part or parts, which gave rise to the product liability claim.

RCW 7.72.010(3).

MacNeil argues that O'Connell was not injured by a relevant product, component part or system manufactured by MacNeil. O'Connell contends that MacNeil sold him a car wash system that did not include the necessary safety component of a bollard or guard. To support their arguments, the parties both cite to *Parkins v. Van Doren Sales, Inc.*, 45 Wn. App. 19, 724 P.2d 389 (1986) and *Sepulveda-Esquivel v. Central Machine Works, Inc.*, 120 Wn. App. 12, 84 P.3d 895 (2004).

In *Parkins*, defendant Van Doren Sales, Inc. (Van Doren) manufactured parts for a pear processing conveyor and supplied Parkins' employer with several parts to assemble one. 45 Wn. App. at 21-22. None of the parts Van Doren supplied were defective and no labels or warnings were provided regarding the dangerous "nip" points that were created when the parts were assembled. *Id.* It may be inferred that Van Doren knew that Parkins' employer was going to assemble the parts to make a new pear line. *Id.* at 22. Parkins was injured because of the dangerous nip point in the assembled pear line. *Id.* at 20-21. The trial court granted summary judgment in favor of Van Doren, dismissing Parkins' defective design and failure to warn claims. *Id.* at 23.

Division Three of our court reversed, finding that Van Doren qualified as a product manufacturer under the Act, stating:

> Van Doren contends it had nothing whatsoever to do with the design, construction, installation, testing or maintenance of the conveyor. . . .
> This conclusion, however, mischaracterizes Van Doren's role in the design, manufacture, and distribution process relevant here. While it did not design, construct, or install the *pear processing line*, it did design and manufacture the

9

> component parts used and installed without substantial modification in assembling the conveyor. It is the design, and subsequent injury because of that design, which form the basis of Ms. Parkins' claim, *i.e.*, *the conveyor parts were designed to be assembled in one unique way and because that design did not incorporate guards or warnings, it is not reasonably safe.* Van Doren is a product manufacturer within the provisions of the act.

*Id.* at 24-25 (alteration in original) (second emphasis added and quotation marks omitted).[3]

In contrast, in *Sepulveda-Esquivel*, 120 Wn. App. at 13-14, the defendants Ulven Forging, Inc. (Ulven) and Central Machine Work, Inc. (Central) forged and supplied, respectively, a hook that was part of a crane used to move heavy objects. The object was secured in the hook by a device called a "mouse," which neither defendant had provided. *Id.* at 16-17. Further, the defendants had not designed the hook and did not know what Sepulveda-Esquivel's employer would do with the hook. *Id.* Sepulveda-Esquivel was injured when an object secured to a crane by the hook fell on him. *Id.* at 13.

The trial court granted Ulven and Central's motion for summary judgment dismissing Sepulveda-Esquivel's product liability claims. *Id.* at 13-14. Our court affirmed, finding that the hook or the assembly of the hook with the mouse was not considered a "relevant product" qualifying under the Act. *Id.* at 19-20. It specifically reasoned:

> In this case, neither Central nor Ulven made, supplied, or sold the finished, completed hook assembly with the mouse. Neither Central nor Ulven was asked to design, forge, make, or sell an interior, locking device on their hook. Because there was no defect in the hook itself, Ulven is without fault; Central is without fault

---

[3] MacNeil cites to *May v. Dafoe*, 25 Wn. App. 575, 578, 611 P.2d 1275 (1980) for the proposition that an injury "must result from the functioning of the relevant product itself and not the actions of third parties." Br. of Resp't at 10. However, *May* does not suggest that a third party's action, in and of itself, negates liability of the product seller/manufacturer. Rather, *May* is consistent with *Parkins*, which determined that the relevant product can be functioning as intended, yet the overall design of said product can be defective due to its lack of incorporated safety components or warnings about dangers related to its design. *See May*, 25 Wn. App. at 578.

because it did not design the hook and merely provided the hook according to the purchaser's specifications, including the lack of a closing device.

*Id.* at 19.

The record in this matter unmistakably shows a genuine issue of material fact as to whether MacNeil was a manufacturer of the relevant product under the definitions in RCW 7.72.010 set out above. Like the manufacturer in *Parkins*, MacNeil sold O'Connell parts for a final product, knowing that O'Connell was going to assemble that product from those parts. Further, MacNeil sold an entire car wash system to O'Connell. Unlike the hook in *Sepulveda-Esquivel*, the parts MacNeil provided were designed to be assembled in a specific way to reach the final result. Critically, MacNeil prepared drawings showing how its car wash equipment would fit into O'Connell's proposed building and additional shop drawings to assist subcontractors in building and installing the equipment. MacNeil controlled whether the car wash equipment system that it put together would work inside of O'Connell's proposed building. From this evidence, a fact finder could reasonably infer that MacNeil was a manufacturer of the car wash and its components under the definitions in RCW 7.72.010(1), (2) and (3).

Contrary to the trial court's determination, it does not matter that MacNeil's equipment was not defective. The *Parkins*' court specifically noted that Van Doren manufactured conveyor parts that were not defective, but were designed to be assembled in a certain way that did not include safety guards. 45 Wn. App. at 21-22. Apart from the differences in the specific products, MacNeil did the same.

MacNeil cites to *Simonetta v. Viad Corp.*, 165 Wn.2d 341, 352-53, 197 P.3d 127 (2008), for the proposition that component sellers are not generally liable when the component itself is not defective. In *Simonetta*, a plaintiff sued under a common law negligence theory for the defendant's failure to warn about the dangers of asbestos. *Id.* at 348-49. The defendant in question provided an evaporator, but not the insulation containing the asbestos. *Id.* at 349. The court found that the defendant had no duty to warn of the hazards related to asbestos because it only supplied the evaporator. *Id.* at 354. In contrast, MacNeil supplied all the components and the design for assembling them into a car wash system, not just a single component that functioned properly like the evaporator. *Simonetta* lends no guidance to the resolution of this appeal.

Finally, MacNeil argues that O'Connell removed specific parts and reinstalled those parts in other locations within the car wash, which shows that the equipment parts provided by MacNeil were individual parts, and not part of an overall system. In *Parkins*, though, the court noted that the employer replaced, modified, and used parts from other entities for the pear processing line. *See Parkins*, 45 Wn. App. at 21-22. Yet, the *Parkins'* court still found that Van Doren qualified as a product manufacturer under the Act. *Id.* at 24-25. Under *Parkins*, MacNeil's argument fails.

For these reasons, the evidence in the record raises a genuine issue of material fact as to whether MacNeil qualifies as a manufacturer under the Act.

### III. UNREASONABLY SAFE

We next turn to whether MacNeil's car wash system was unreasonably safe because of its design or because of lack of adequate warnings or instructions.

12

No. 49161-3-II

A.    Legal Principles

In order to show that a product was unreasonably safe because of its design or lack of

warnings, a plaintiff may rely on the "risk-utility" test, *see* RCW 7.72.030(1)(a), (b), or the

"consumer expectations" test, RCW 7.72.030(3). *Anderson v. Weslo*, *Inc*., 79 Wn. App. 829,

838, 906 P.2d 336 (1995).

RCW 7.72.030(1)(a) outlines the risk-utility test for a design defect theory in the

following terms:

> A product is not reasonably safe as designed, if, at the time of manufacture, the
> likelihood that the product would cause the claimant's harm or similar harms, and
> the seriousness of those harms, outweighed the burden on the manufacturer to
> design a product that would have prevented those harms and the adverse effect that
> an alternative design that was practical and feasible would have on the usefulness
> of the product.

Similarly, RCW 7.72.030(1)(b) outlines the risk-utility test for a failure to warn theory as

follows:

> A product is not reasonably safe because adequate warnings or instructions were
> not provided with the product, if, at the time of manufacture, the likelihood that the
> product would cause the claimant's harm or similar harms, and the seriousness of
> those harms, rendered the warnings or instructions of the manufacturer inadequate
> and the manufacturer could have provided the warnings or instructions which the
> claimant alleges would have been adequate.

The consumer expectation test is more direct. Under this test, the plaintiff must show the

product was more dangerous than the ordinary consumer would expect. *Thongchoom*, 117 Wn.

App. at 305; RCW 7.72.030(3).

Under either test, evidence of industry custom and technological feasibility is relevant.

*Falk v. Keene Corp.*, 113 Wn.2d 645, 655, 782 P.2d 974 (1989) (citing RCW 7.72.050 (1)).

However, industry custom, although relevant, is *not required* for a nonmoving party to survive

13

summary judgment on a products liability claim. *See Soproni v. Polygon Apt. Partners*, 137

Wn.2d 319, 328-29, 971 P.2d 500 (1999).

B.      Unreasonably Safe Design

O'Connell argues that the car wash system MacNeil sold to him was of an unreasonably

safe design because it failed to include bollards or other safety precautions to protect O'Connell

from unintentional accelerations.  We hold that O'Connell created a genuine issue of fact on this

issue under both a risk-utility and consumer expectation theory.

1.      Risk-Utility

MacNeil's expert, Miller, opined that bollards were not the industry standard for car

washes.  Thus, under a summary judgment standard, O'Connell was required to point to

evidence in the record that created a genuine issue of material of fact as to whether the design

was unreasonably safe.  *See Walston*, 181 Wn.2d at 395-96.  As noted, O'Connell was not

required to show evidence of industry standards or custom.  *See Soproni*, 137 Wn.2d at 328-29.

O'Connell cites to Sloan's declaration, which he believes shows that "the injury in this

case is a well known problem in the car wash industry."  Reply Br. of Appellant at 3; *see* Br. of

Appellant at 10.  Sloan opined in his declaration that MacNeil should have known about

unintended accelerations of vehicles at the entrance of car washes.  To support this conclusion,

Sloan relied on Analetto's article, which states:  "Bollards Equal Safety" because attendants may

"stand safely behind the post as they guide customers onto the conveyor."  CP at 503.  Sloan also

refers to a 2006 International Car Wash Association press release, announcing the danger of

vehicles when they suddenly accelerate and injure car wash attendants.

14

MacNeil does not argue that Sloan's opinions should be excluded due to an inadequate foundation. Instead, MacNeil asks us to find his opinion "unconvincing," Brief of Respondent at 14, essentially asking us to question the weight of Sloan's opinion as part of balancing the evidence, an exercise we are not permitted at the summary judgment stage. *See Nichols*, 197 Wn. App. at 498. With that, we conclude that Sloan's declaration creates a genuine issue of fact as to the likelihood of harm from the absence of bollards and whether MacNeil was aware of this type of danger in the car wash industry. Although Sloan's evidence is not grounded in industry custom, the genuine issues of fact that it raises are sufficient to preclude summary judgment. *See Soproni*, 137 Wn.2d at 328-29.

In terms of the burden on MacNeil to include bollards in its design, Sloan opined that the cost of bollards is nominal relative to other system costs. The record supports this conclusion as O'Connell paid approximately $1,000 for the installation and purchase of bollards, while paying nearly $478,000 to MacNeil for its entire car wash system. Further, as to whether the alternative design would be practical, Sloan opined that "[i]f properly configured, bollards do not interfere with the ability of operators to perform their tasks." CP at 442. MacNeil does not attempt to rebut this conclusion.

Thus, under the risk-utility approach, O'Connell created a genuine issue of fact as to whether its car wash system was defectively designed because it failed to include bollards or other safety precautions. Summary judgment was therefore improper.

2.      Consumer Expectation

As noted, the heart of the consumer expectation test is whether MacNeil's car wash design was more dangerous than the ordinary consumer would expect. We conclude that the evidence also creates a genuine issue of fact as to this issue.

MacNeil represented on its website that its company has "the largest, most trusted, dependable car wash equipment people in the world." CP at 536-37. Included in the "dependable design" were safety precautions such as flags to protect employees' heads from car wash equipment. CP at 536-37. A representative of MacNeil also told O'Connell that the correlator system would safely guide vehicles onto the tracks in the car wash. As already noted in the risk-utility analysis above, there was some sentiment within the car wash industry that bollards should be used at the entrances of car washes to protect attendants.

This evidence raises a genuine issue of fact as to whether the lack of a bollard or other safety measure in its car wash design would be considered more dangerous than the ordinary consumer would expect. With that, summary judgment was improper under this test, also.

C.      Unreasonably Safe Due to Inadequate Warnings

Next, O'Connell contends that he raised a genuine issue of fact as to whether MacNeil should have warned him that the correlator-conveyor system would not prevent vehicles from dangerously jumping off the conveyor guard rail.

MacNeil argues that "the risk of injury in working in front of moving vehicles and directing moving vehicles is obvious." Br. of Resp't at 17. To support its argument, MacNeil cites to *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 140-41, 727 P.2d 655 (1986), which recognizes that a manufacturer does not have to warn of obvious dangers that are inherent in a

16

product. In addition, MacNeil's expert, Miller, opined that the collator-conveyor is not designed to contain a vehicle that is out of control.

O'Connell counters that he created a genuine issue of fact as to whether the hazard at hand was obvious. To support his contention, O'Connell cites to Sloan's declaration where he opined that the issue was not whether the correlator-conveyor failed at its intended function, but rather whether MacNeil "could reasonably anticipate that these components were insufficient to prevent an entering vehicle from intruding into the area occupied by the worker." CP at 446; Reply Br. of Appellant at 5. Sloan further opined that MacNeil

> should have warned John O'Connell about the risk of vehicles jumping over the guide rail due to sudden unintended accelerations and recommended the inclusion of one or more bollards (or other means of guarding) near the entrance to the car washes for attendants to stand behind when guiding vehicles onto the conveyor.

CP at 446.

### 1. Risk-Utility

As already noted, a representative of MacNeil told O'Connell that the correlator would safely guide vehicles onto the tracks in the car wash. If, as MacNeil admits, the correlator and conveyor were not intended to prevent vehicles from accelerating out of control, then this evidence creates a genuine issue of fact as to whether O'Connell should reasonably have anticipated the danger. As discussed in the design defect analysis above, Sloan's declaration and supporting exhibits are evidence of a risk to attendants from unintentional accelerations and that bollards would protect employees from that risk. Evidence also indicated that simply including a warning would have been eminently feasible. Under the risk-utility test, this evidence created genuine issues of material fact as to whether the failure to warn made the

relevant product unreasonably safe. Thus, summary judgment was improper under the risk-utility test.

### 2. Consumer Expectation

Under the consumer expectation test, the evidence and circumstances discussed above also create a genuine issue of material fact as to whether the absence of a warning made the product more dangerous than the ordinary consumer would expect. *Thongchoom*, 117 Wn. App. at 305; RCW 7.72.030(3). Thus, summary judgment was also improper under this test.

### D. Policy Considerations

O'Connell asks our court to consider the policy considerations behind the Act and the Washington Industrial Safety and Health Act in its analysis. With our reversal of the summary judgment order, it is unnecessary to delve into these issues.

## IV. ATTORNEY FEES

O'Connell requests attorney fees under RAP 18.1. RAP 18.1 allows our court to award attorney fees and costs if "applicable law" permits. Thus, a party is required to provide citation to the applicable law, with accompanying argument, for the basis to award attorney fees and costs under RAP 18.1. *See Pruitt v. Douglas County*, 116 Wn. App. 547, 560, 66 P.3d 1111 (2003). Because O'Connell does not do this, we decline to award attorney fees under RAP 18.1.

MacNeil requests attorney fees and costs under RAP 18.1, 14.2, and RCW 4.84.010.[4] RCW 4.84.010 allows an award of "certain sums [by way of indemnity] for the prevailing party's expenses in the action" including statutory attorney fees. *Moe v. Wise*, 97 Wn. App. 950,

---

[4] In its brief, MacNeil incorrectly cites to "RCW 4.85.010." Br. of Resp't at 20. This clearly was intended to refer to RCW 4.84.010.

No. 49161-3-II

970, 989 P.2d 1148 (1999).  Similarly, RAP 14.2 awards costs to the party that substantially

prevails on review.   Because MacNeil does not prevail, we decline to award it statutory attorney

fees and costs under RCW 4.84.010 or costs under RAP 14.2.

CONCLUSION

We reverse the trial court's summary judgment order and remand this case for further

proceedings.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040,

it is so ordered.

Bjorgen, C.J.

We concur:

Melnick, J.

Sutton, J.