IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CORINA PUENTE, individually and as Personal Representative of the Estate of Javier Puente, deceased, | ) ) ) ) | No. 76604-0-I |
| | ) | DIVISION ONE |
| Appellant, | ) ) | |
| v. | ) ) | |
| RESOURCES CONSERVATION COMPANY INTERNATIONAL, a Delaware Corporation and a SUBSIDIARY of GE IONICS, INC., a Massachusetts Corporation, | ) ) ) ) ) ) | PUBLISHED OPINION |
| Respondent, | ) ) | |
| BAUGH INDUSTRIAL CONTRACTORS INC., a Washington Corporation; SKANSKA USA BUILDING, INC., a Delaware Corporation; STIRRETT-JOHNSEN, INC., a Washington Corporation; HARRIS GROUP, INC., a Washington Corporation; and NIPPON CHEMI-CON, a Japanese Corporation, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | FILED: October 22, 2018 |

2018 OCT 22 AM 9: 44

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

SCHINDLER, J. — Chemi-Con Materials Corporation (CMC) manufactures anode aluminum foils for electrolytic capacitors. The manufacturing process produces liquid boric acid. A boric acid evaporator system (BAES) converts the 180-degree liquid boric acid into distilled water for reuse in manufacturing anode

aluminum foil and into solid waste for disposal. In July 2012, CMC worker Javier Puente suffered fatal injuries while performing maintenance work on the BAES pump that had been installed in the environmental building of the facility in 2002. Corina Puente individually and as the personal representative of the Estate of Javier Puente (collectively, the Estate) filed a lawsuit against GE Ionics Inc. and Resources Conservation Company International (collectively, RCCI) alleging claims of negligence and liability under the Washington product liability act (WPLA), chapter 7.72 RCW. The court ruled on summary judgment that the lawsuit against RCCI is barred by the six-year statute of repose for claims arising from construction, design, or engineering "of any improvement upon real property."[1] The Estate appeals the order granting summary judgment dismissal of the lawsuit and the order denying reconsideration. We conclude the BAES installed in the environmental building is not an improvement upon real property and reverse and remand.

FACTS

Chemi-Con Materials Corporation (CMC) is a wholly owned subsidiary of Nippon Chemi-Con Corporation (NCC). CMC manufactures anode aluminum foils at its facility in Moses Lake, Washington. NCC uses the anode aluminum foils to manufacture aluminum electrolytic capacitors.

The CMC manufacturing facility at Moses Lake operated in a building originally built as a United States Air Force base hanger. CMC decided to

---

[1] RCW 4.16.300.

expand the west bay building of the existing facility and add six new aluminum formation machines to increase production.

Baugh Industrial Contractors Inc.[2] was the general contractor for the approximately $32.6 million "Large Phase 3" (LP3) "West Bay Expansion Project." Baugh retained architect and engineering firm Harris Group Inc. to design the expansion. Stirrett-Johnsen Inc. was the mechanical piping subcontractor.

The LP3 West Bay Expansion Project began in 2000. In addition to the six new aluminum formation machines in the main facility, the "environmental building" was expanded to house utility systems and "support equipment," including "[c]ity water reverse osmosis" systems, deionization units, a phosphoric acid recovery system, air compressors, and a new, larger boric acid evaporator system (BAES). A BAES converts the liquid boric acid produced during the manufacturing of anode aluminum foils into distilled water and into solid waste for disposal. The distilled water is stored in a condensate tank and reused in the manufacturing process.

Baugh entered into a contract with GE Ionics Inc. and Resources Conservation Company International (collectively, RCCI)[3] for the new BAES. RCCI designs, builds, and sells industrial evaporator and wastewater treatment systems worldwide:

> RCCI produces detailed piping and instrumentation drawings and installation blueprints for its systems, procures the components that comprise the system, and then works with the relevant general contractor to ensure the system is constructed according to plan.

___

[2] Skanska USA Building Inc. acquired Baugh in 2000.

[3] In 2001, RCCI was doing business as "RCC Ionics."

After construction is complete, RCCI provides startup assistance and technical support services as the general contractor and the customer work to bring the system online. RCCI does not manufacture any components of its boric acid evaporator systems, but instead provides design and specification services.

The contract between Baugh and RCCI identifies RCCI as the "Seller." The contract states the Seller shall provide "the design, procurement, manufacturing, and delivery of Boric Acid Evaporator System."

Exhibit B identifies the scheduled delivery dates for the components for the BAES, including tanks to collect and store the liquid boric acid produced during the manufacturing process, a heat exchanger and recirculation pump, a "heater shell," and a 4- to 5-story or 50- to 60-foot-tall evaporator tank or "vapor body" to be located outside the environmental building.

Exhibit C identifies the technical design specifications for the BAES:

Vendor agrees to supply the design, procurement, manufacturing, and delivery of the Boric Acid mechanical vapor recompression type evaporator system designed for 32 gpm[4] average flow and 40 gpm peak flow per the design conditions listed in RFP[5] 05-870/Q/2003 and per the scope of supply that includes, but is not limited to the following:

1. Complete evaporator assembly. . . .

2. Heat Exchangers

3. Pumps

4. Liquid/solid separation equipment

5. Compressors

6. Control valves and in-line instruments

7. All interconnecting piping and ductwork up to owner interface

---

[4] Gallons per minute.
[5] Request for proposal.

8. Support structure for furnished equipment. RCC[I] to provide the vapor body support legs, upper access platform, and ladder. RCC[I] to provide support legs for heater. RCC[I] to provide 4'x30' maintenance platform for heater including access ladder.

9. All manual valves

10. Painting. . . .

11. Motors — High Efficiency . . . .

12. Noise insulation system. RCC[I] to provide noise insulation blankets for both compressors to achieve performance of 86-88 dBA[6] @ 3ft.

13. Control panels and PLC[7] control system

14. Design engineering and drawings

15. Erection supervision, training, and start-up assistance as required and requested from Contractor and/or Owner . . . .

16. Testing to verify equipment fabrication, operation, and process guarantees

17. All electrical and control equipment will be UL[8] rated. . . .

18. Flow Transmitters will be used in place of magnetic flow meters due to the low conductivity of the fluids.

CMC issued a certificate of completion for the LP3 West Bay Expansion Project on August 23, 2002. The "Project Completion Report" describes the work completed and the new equipment installed. The report identifies the BAES as a new "major process" system that is "[m]ajor equipment installed as part of the LP3 west bay expansion project." The RCCI BAES "Maintenance Manual"

---

[6] Decibels.

[7] Programmable logic controller.

[8] Underwriters Laboratory.

contains "the equipment manufacturers' instructions for installation and maintenance" of the BAES.

On July 23, 2012, CMC shut down the Moses Lake "manufacturing plant" for "routine maintenance." Sixty-four-year-old Javier Puente had been a CMC maintenance department employee for more than 10 years and had been responsible for maintenance of the BAES for "many years." Before performing maintenance on the BAES recirculation pump located in the environmental building, the CMC employees drained the liquid from the BAES. Puente and the other maintenance workers removed the bolts that attached the BAES recirculation pump to the piping system. Puente was "standing near the joint between the pump and the piping system" when a large volume of 180-degree "boric acid solution" burst onto him. Puente died two days later from thermal burns to 80 percent of his body.

Corina Puente individually and as the personal representative of the Estate of Javier Puente (collectively, the Estate) filed a lawsuit against GE Ionics Inc. and Resources Conservation Company International (collectively, RCCI) alleging claims of negligence and liability under the Washington products liability act (WPLA), chapter 7.72 RCW.[9] The Estate alleged RCCI is a "product manufacturer." The Estate alleged RCCI negligently installed equipment, provided defective designs and equipment, did not design a reasonably safe

---

[9] When the Estate filed the lawsuit, RCCI was doing business as "GE Power & Water." The Estate also sued Baugh, Skanska USA, the Harris Group, Stirrett-Johnsen, and CMC parent company NCC.

BAES, breached express and implied warranties, and did not provide adequate warnings.

A chemical engineer expert retained by the Estate concluded the BAES designed by RCCI was "inherently dangerous."

> [I]t is my opinion that Defendant RCCI designed the BAES, knowing that the hazard of hot boric acid solution would exist and that the recirculation pump would need to be removed for maintenance periodically, and did not provide any way to block the hazard of hot boric acid solution when workers removed the recirculation pump for maintenance. It is my opinion that Defendant RCCI designed a product that was inherently dangerous because Defendant RCCI knew that the BAES included wearable parts that would require maintenance (e.g., the recirculation pump), and they did not include double block and bleed mechanisms so that the pump could be safely removed without workers being exposed to the hazard of hot boric acid solution.[10]

RCCI filed a motion for summary judgment dismissal on the grounds that the six-year construction statute of repose barred the lawsuit. RCW 4.16.300 states actions or claims arising from construction of an improvement upon real property are subject to the six-year construction statute of repose. RCW 4.16.310 bars claims that accrue within six years of substantial completion. RCCI argued the BAES is an improvement upon real property because it was integral to the function of the environmental building.

In opposition to summary judgment, the Estate argued the construction statute of repose did not bar the lawsuit because the record established the BAES was part of the manufacturing process, not an improvement upon real property.

---

[10] CMC replaced the BAES that RCCI designed after Puente was severely injured.

The court entered an "Order Granting Defendant Resources Conservation Company International's Motion for Summary Judgment Pursuant to Construction Statute of Repose." The court denied the motion for reconsideration. The order denying reconsideration states the court finds RCCI are "engineers entitled to the protection of the construction statute of repose in RCW 4.16.300 and 4.16.310 against Plaintiff's claims herein," the claims "arise out of construction activities related to improvements upon real property," and the claims "accrued after the expiration of the construction statute of repose in RCW 4.16.300 and 4.16.310."

The Estate appeals the summary judgment order of dismissal and the order denying the motion for reconsideration.[11]

ANALYSIS

The Estate contends the court erred in ruling that the BAES is an improvement "upon real property" barred by the construction statute of repose.

We review an order of summary judgment dismissal de novo and engage in the same inquiry as the trial court. Kofmehl v. Baseline Lake, LLC, 177 Wn.2d 584, 594, 305 P.3d 230 (2013). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Kofmehl, 177 Wn.2d at 594. A material fact is one upon which the outcome of the litigation depends. Owen v. Burlington N. Santa Fe R.R., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). We consider all

---

[11] The court also dismissed the lawsuit against the general contractor Baugh, Skanska USA, the construction project architect and engineer the Harris Group, the mechanical piping subcontractor Stirrett-Johnsen, and CMC parent company NCC as barred by the six-year statute of repose. The Estate does not appeal the order dismissing these defendants.

facts and make all reasonable factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989). Summary judgment should be granted only "if reasonable minds could reach only one conclusion from the evidence presented." Estate of Becker v. Avco Corp., 187 Wn.2d 615, 621, 387 P.3d 1066 (2017); Allen v. State, 118 Wn.2d 753, 760, 826 P.2d 200 (1992).

"A statute of repose terminates the right to file a claim after a specified time even if the injury has not yet occurred." Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Constr. Co., 176 Wn.2d 502, 511, 296 P.3d 821 (2013). The construction statute of repose bars all claims arising from construction of "any improvement upon real property" that has not accrued within six years after substantial completion. RCW 4.16.300, .310.

RCW 4.16.300 states:

RCW 4.16.300 through 4.16.320 shall apply to all claims or causes of action of any kind against any person, arising from such person having constructed, altered or repaired any improvement upon real property, or having performed or furnished any design, planning, surveying, architectural or construction or engineering services, or supervision or observation of construction, or administration of construction contracts for any construction, alteration or repair of any improvement upon real property. This section is specifically intended to benefit persons having performed work for which the persons must be registered or licensed under RCW 18.08.310 [(architects)], 18.27.020 [(contractors)], 18.43.040 [(engineers and land surveyors)], 18.96.020 [(landscape architects)], or 19.28.041 [(electricians)], and shall not apply to claims or causes of action against persons not required to be so registered or licensed.

RCW 4.16.310 states, "All claims or causes of action as set forth in RCW 4.16.300 . . . which ha[ve] not accrued within six years after such substantial completion of construction . . . shall be barred." There is no dispute the Estate

9

filed the lawsuit against RCCI more than six years after substantial completion of the CMC LP3 expansion project.

RCCI and the Estate dispute whether the BAES is an "improvement upon real property" under RCW 4.16.300 that is barred by the six-year statute of repose. RCW 4.16.310.

The Washington Supreme Court decision in Condit v. Lewis Refrigeration Co., 101 Wn.2d 106, 676 P.2d 466 (1984), controls. In Condit, the court rejected the analysis but affirmed the result in Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co., 81 Wn.2d 528, 503 P.2d 108 (1972), and Pinneo v. Stevens Pass, Inc., 14 Wn. App. 848, 545 P.2d 1207 (1976). Condit, 101 Wn.2d at 109-10. The court in Condit concluded the statute of repose, RCW 4.16.300, applies only to claims "against any person, arising from such person having constructed, altered or repaired any improvement upon real property" and specifically, "construction activities, including designing, planning, surveying, architectural, or construction or engineering services." Condit, 101 Wn.2d at 110. Because "[e]ach of these activities relates to the process of building a structure," the court rejected the analysis in Yakima Fruit and Pinneo[12] as contrary to the intent of the statute. Condit, 101 Wn.2d at 109-10. The court held the statute "focuses on individuals whose activities relate to construction of the

_____

[12] In Yakima Fruit, the court looked to the "manner, purpose and effect of annexation to the freehold" to determine "whether improvements or installations on the realty retain their character as personalty or become a part of the realty." Yakima Fruit, 81 Wn.2d at 530-31. In Pinneo, the court cited Siegloch v. Iroquois Mining Co., 106 Wash. 632, 636, 181 P. 51 (1919), to conclude an improvement upon real property is a "betterment of a permanent nature which added to the value of the property as real property." Pinneo, 14 Wn. App. at 851.

improvement, rather than those who service or design items within the improvement." Condit, 101 Wn.2d at 110.

With respect to "those who service or design items" installed within a building, the court observed that "if these individuals were protected, they could easily avoid product liability law, if they desired, by simply bolting, welding the equipment or fastening it in some other manner to the building." Condit, 101 Wn.2d at 110-11. The court held, "Mechanical fastenings may attach a machine to the building, but they do not convert production equipment into realty or integrate machines into the building structure, for they are not necessary for the building to function as a building." Condit, 101 Wn.2d at 111.

The court concluded the engineering and design of the conveyer belt and refrigeration unit that caused the injury to the plaintiff was not an improvement upon real property. Condit, 101 Wn.2d at 112. But instead, the conveyor belt and refrigeration unit were engineered and designed as part of the "manufacturing process taking place within the improvement." Condit, 101 Wn.2d at 112.

> Rather than designing an improvement on real property, respondent was engineering and designing accoutrements to the manufacturing process taking place within the improvement. As such, they are more properly subject to product liability law and its statute of limitations.

Condit, 101 Wn.2d at 112.

The decisions in Pinneo and Yakima Fruit are consistent with the analysis adopted in Condit and further amplified in 1519-1525 Lakeview Boulevard

Condominium Ass'n v. Apartment Sales Corp., 144 Wn.2d 570, 29 P.3d 1249 (2001).

In Pinneo, the operator of the Stevens Pass ski area retained a contractor to replace and install a ski lift. Pinneo, 14 Wn. App. at 849. Yakima Fruit involved the repair of a building refrigeration system integrated into the structure of the building such that the system could not be removed from the building with either the system or the building remaining intact. Yakima Fruit, 81 Wn.2d at 529-31. The repair required the removal of an entire floor of the building structure. Yakima Fruit, 81 Wn.2d at 529.

In Lakeview, the Washington Supreme Court considered the class of persons affected by the statute, noting that the statute applies to claims of any kind against any person arising from that person having constructed, altered, or repaired any improvement upon real property or from having performed or furnished a limited set of delineated services for the construction, alteration, or repair of any improvements on real property. Lakeview, 144 Wn.2d at 578 (citing RCW 4.16.300). In further defining the class of persons affected by the statute, the court drew a number of distinctions between contractors who are within the class of persons affected by the statute and manufacturers who are not. Lakeview, 144 Wn.2d at 578-79.

As relevant here, the court noted (1) manufacturers are subject to product liability laws that have their "own statutes of limitation" tied to the "useful life of the product," (2) contractors "make a unique product designed to deal with the

distinct needs of a particular piece of real estate,"[13] (3) contractors "build improvements upon real estate in an ever-changing environment," and (4) manufacturers "do not contribute to the structural aspects of real estate improvements." Lakeview, 144 Wn.2d at 579.[14]

Here, the record establishes the BAES equipment located in the environmental building, including the pump Puente was working on at the time of his fatal injury, was integral to the operation of the production lines and the manufacturing process. CMC vice president Joseph Akers testified the BAES is essential to the manufacturing process:

> Q. And the — and tell us again what the purpose or the intent of that entire system is.
> A. To evaporate the boric waste stream.
> Q. Because if you didn't do that what would be the consequence?
> A. We couldn't operate the facility.
> Q. Okay. . . . And, just to follow up, why isn't it that you couldn't operate the facility if you didn't have this system in place?
> A. Because our process utilizing the boric acid to form our product it has that waste stream and that waste stream we can't just dump anywhere, we have to treat it based on a permit that we're issued.
> Q. I see. Okay. So if that system shuts down the plant shuts down?
> A. Yes.
>  . . . .
> Q. And I believe you say, I just want to make sure, that the system that we see . . . is it fair to say it's crucial to the operation of the plant?
> A. Yes.
> Q. And this is what you're referring to if that system goes down then the plant has to go down for a little while, correct?
> A. Yes.
>  . . . .

---

[13] RCCI argues it produces unique equipment for every site, but the unique design is driven by the manufacturing process, not by the distinct needs of a particular piece of real estate.

[14] Emphasis added.

13

Q.    I think you said earlier — I think you were answering questions because of the critical nature, the Boric Acid Evaporator System. What did you mean by that?

A.    Without the Boric Evaporator System operating, we can't operate the production lines.

The Supreme Court in Condit and Lakeview has been very clear that in order for a mechanical system within a building constructed on real property to be integral so as to constitute an "improvement upon real property," the system must actually be integrated into and a part of the structure itself. Condit, 101 Wn.2d at 112; Lakeview, 144 Wn.2d at 578-79; RCW 4.16.300. The record establishes the BAES equipment located in the environmental building was not integral to the environmental building structure. Rather, the equipment was simply "house[d]" within the environmental building. Akers testified part of the LP3 project was to expand the environmental building to "house additional equipment," including the BAES:

Q.    So tell — what sort of additions to the physical plant took place out there, modifications to the physical plant took place out there as part of the LP3 expansion?

A.    So in production we added of course the six additional formation lines with all the equipment that's related to that on the production side. We added additional cooling capabilities, so cooling towers and air cooled heat expansion changers, the environmental building was expanded to house the additional equipment used to either supply product to production or to handle the waste in production.

Q.    So had there — I have heard talk of this environmental building, was there always an environmental building in existence in some fashion since the time you got there in '95?

A.    Yes.

Q.    But what happened in 2000 is that it was expanded?

A.    Correct.

Q.    And what was the purpose of why was it expanded?

A.    To house the additional equipment needed to treat the additional formation lines.

. . . .

14

Q.      So it's fair to say that that vapor body that we see there is part of an entire system?

A.      Correct.

Like the conveyor belt and freezer tunnel system in Condit, we conclude the BAES is an "accoutrement[ ] to the manufacturing process taking place within the improvement." Condit, 101 Wn.2d at 112.

We reverse and remand.

Schindler, J.

WE CONCUR:

Appelwick, C.J.

Becker, J.

15