IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| VALERIE STROUT, a single person; and KATHRYN HANEY, a single person, | ) ) ) ) | No. 77235-0-I |
| Appellants, | ) ) ) | DIVISION ONE |
| v. | ) ) ) | |
| WAL-MART STORES, INC., a Delaware Corporation; and PLY GEM PACIFIC WINDOWS CORPORATION, a Delaware Corporation, as successor to INSULATE INDUSTRIES, INC., | ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Respondents, | ) ) | |
| VICKI McGEE, a single person; and HAIER AMERICA TRADING, LLC, a Delaware Corporation, | ) ) ) ) | |
| Defendants. | ) | FILED: July 29, 2019 |

SCHINDLER, J. — Valerie Strout fell out of the window of a second-story townhouse while trying to grab a portable air conditioner. Strout landed headfirst on the concrete patio. Strout and her daughter Kathryn Haney (collectively, Strout) filed a negligence and product liability lawsuit against the townhouse building owner Vicki McGee, the portable air conditioner manufacturer Haier America Trading LLC, Wal-Mart Stores Incorporated, and window manufacturer Ply Gem Pacific Windows Corporation.

The defendants filed summary judgment motions to dismiss. The court denied the motion to dismiss claims against McGee and the claims against Haier under the Washington products liability act (WPLA), chapter 7.72 RCW. The court dismissed the WPLA claims against Wal-Mart and Ply Gem. Strout appeals dismissal of Wal-Mart and Ply Gem. We affirm dismissal of the WPLA claims against Ply Gem. We reverse dismissal of the WPLA claim against Wal-Mart as a product seller under RCW 7.72.040, and remand for trial.

## FACTS

Vicki McGee owned a two-story building with four residential townhouse units in Auburn, Washington. The building was constructed between 1979 and 1981. Each residential unit has a garage with a recessed front entry and a backyard.

On October 1, 2012, McGee entered into a rental agreement with Valerie Strout to rent the three-bedroom townhouse unit located at the west end of the building. Strout told McGee that her boyfriend Robert Lang had experience doing remodel work and managing rentals. McGee agreed to pay Lang $25 an hour and reduce the rent for work on the townhouse.

Strout, her 14-year-old daughter, and Lang moved into the townhouse. There is a living room, kitchen, and a bathroom on the first floor and three bedrooms and a bathroom on the second floor. Strout and Lang occupied the second floor south-facing bedroom above the backyard and concrete patio.[1] The bedroom is approximately 11 feet by 16 feet with a floor-to-ceiling height of 7 feet 8 inches. A window is located at the southwest corner of the bedroom. The window opening was designed for a 4-foot 8-inch by 3-foot 10-inch window.

---

[1] McGee installed the concrete patio in the backyard of the unit in approximately 2008.

In 1993, the building owner replaced the original window with a new vinyl sliding-glass window manufactured by Insulate Industries Incorporated. The left side of the vinyl sliding-glass window is fixed. The right side of the window or "sash" is a horizontal slider. The sliding sash "moves from right to left to open the window." The sliding glass window has "two separate locking devices." However, if the window sash is opened "more than about three inches," both locking devices "become inoperable."

The second floor south-facing bedroom is exposed to "significant solar heat" during the summer months. On July 1, 2013, Lang and Strout went to the Wal-Mart in Federal Way to purchase an air conditioner unit. Lang and Strout decided to purchase a portable air conditioner manufactured by Haier American Trading LLC. Lang said it was the only portable air conditioner unit left on the shelf that was "reasonably priced." The box appeared to have been "opened and then taped shut again" and had "been wrapped" in "clear" packing tape.

There were two illustrations of a double-hung window on the box. The top of the box stated the " '[c]ontents in carton' " included the air conditioning unit, window installation parts, a "User and Care Guide," and a "Quick Start Guide." When Lang opened the box to install the air conditioner, the User and Care Guide and some of the parts were missing. Lang said the box contained the Haier Quick Start Guide "folded in half, not in a . . . plastic sleeve"; "one bracket"; and "a few loose screws."[2]

Lang bypassed the sliding glass window locking devices to open the right side of the window and install the air conditioner. Lang used one of the brackets that came in the box and a "shelf bracket" to install the air conditioner: "I didn't have all the parts, but one piece I did have was a 90-degree bracket with a screw hole in it." Lang placed the

---

[2] Boldface omitted.

3

"ridge in the bottom of the air conditioner . . . into the frame of the window on the sliding portion, so that it sat down into the track." Lang said, "[T]here was a protrusion on the bottom of the air conditioner that fit into that groove[ ]in the recessed part of the [window] channel." Lang fit one of the two brackets "onto the fixed piece of the frame." "[T]he other [bracket] rested against the sliding part of the window." Lang then "closed the window onto the air conditioner."

Lang told Strout "not to open the window" because the window was "holding the air conditioner in" and "nothing was affixing the bracket to any inanimate object or any solid surface."[3]

> Q.  Other than the sliding window, was there anything holding this air conditioner in place?
> A.  The brackets.
> Q.  But that was only when the window was closed, correct?
> A.  Correct.
> Q.  Onto the air conditioner.
> A.  Correct.
> Q.  Once someone — should someone open that window, the air conditioner could fall out?
> A.  Yes, it could.  The bracket on the other side helped maintain it, but with it being unbalanced, it could.[4]

Lang used cardboard to seal approximately two feet of "open space between the top portion of the air conditioner and the top of the sliding window" to "keep as much of the heat out as possible."[5]  Lang turned on the air conditioner "and left it on" throughout the summer.  In the fall, Lang removed and stored the air conditioner in a closet.

---

[3] Boldface omitted.
[4] Boldface omitted.
[5] Boldface omitted.

4

In late June or early July 2014, Lang installed the portable air conditioner in the second-floor-bedroom sliding window "in exactly the same way."[6] However, instead of cardboard, Lang used a black curtain to close the space "between the top of the air conditioner" and the top of the window.

On July 5, Strout and Lang spent the day with two friends from out of town. At approximately 6:30 p.m., Strout went upstairs to take a nap. Lang and their friends were outside on the patio.

Strout remembers that before taking a nap, she went to the bedroom window, moved the curtain, and called down to Lang, " 'Hey, let the dog out.' " Lang saw Strout "pull[ ] the curtain back" with "one hand that was holding the curtain." Lang said he was "about to" respond when he saw Strout "lean forward and try to grab the air conditioner," and then fall out of the window.

One of their friends, Deborah Heins, saw Strout "appear at the window in the upstairs bedroom." Heins said Strout "started to say something" and "as she did, the air conditioning unit in the window appeared unsteady." Heins said that when Strout "reached for the air conditioning unit, the weight of the air conditioner seemed to pull her through the window."

Strout landed headfirst on the concrete patio. Strout suffered a serious permanent injury that paralyzed her from the waist down.

Valerie Strout and her minor daughter Kathryn Haney (collectively, Strout) filed a lawsuit against building owner Vicki McGee; air conditioner manufacturer Haier America Trading LLC; Wal-Mart Stores Incorporated; and window manufacturer Ply Gem Pacific Windows Corporation, the successor to Insulate Industries Incorporated. Strout alleged

---

[6] Boldface omitted.

claims against McGee for breach of duty as a property owner, breach of contract, breach of the warranty of habitability, negligent maintenance and repair, and failure to ensure a safe construction site. Strout alleged claims against Haier, Wal-Mart, and Ply Gem under the Washington products liability act (WPLA), chapter 7.72 RCW.

McGee, Ply Gem, Haier, and Wal-Mart filed separate motions for summary judgment dismissal. McGee argued she did not breach the duty of care owed to Strout; the Residential Landlord-Tenant Act of 1973, chapter 59.18 RCW; or the Washington Industrial Safety and Health Act of 1973, chapter 49.17 RCW, regulations and chapter 296-24 WAC, "General Safety and Health Standards."

Ply Gem argued it did not defectively design the window and it had no duty to warn Strout about "obvious or known dangers."[7] Ply Gem argued Strout could not establish proximate cause because when Lang installed the air conditioner, he "rendered [the] locking features on the window . . . useless."

Haier and Wal-Mart argued Strout could not establish proximate cause. Haier and Wal-Mart cited Lang's testimony that even if he had read the User and Care Guide that states the air conditioner unit was for use with only a double-hung window, he "[m]ost likely" would have installed the air conditioner unit in the sliding window.

> Q.    And would you turn to Page 6 [of the User and Care Guide].
> Now, at the bottom of this page it says "Installation Requirements," does it not?
> A.    Yes.
> Q.    And at the top of the page it says "Location Requirements," correct?
> A.    Yes.
> Q.    And under the "Note" section of these installation requirements, there are three bullet points.
> A.    Yes.

---

[7] Emphasis omitted.

6

Q. And the third bullet point states, "The air conditioner must not be installed in a through-the-wall sleeve or in a wall. It can only be installed in a double-hung window."

Did I read that accurately?

A. Yes.

Q. If you had read that, would you have installed this air conditioner in the sliding window?

A. Most likely.

Q. Why?

A. Because I needed it. It was hot, it was uncomfortable, it — I wasn't aware of any other type of unit that I could purchase that would do what I needed it to do, so — I may have made different accommodations, but I probably still would have used it.

Q. And would you agree that had you read this and had you installed it, despite what the manufacturer is stating, that it can only be installed in a double-hung window, you would have been violating the installation requirements?

A. Yes.

Q. Would you turn to Page 12 of the user and care guide.

A. I'm there.

Q. Do you see the two illustrations of the double-hung window at the top of this page?

A. Yes.

Q. And then do you see at the bottom of Page 12 the caption is "How to Install" the air conditioner, and do Instructions 4 through 9 instruct the customer that they need to screw the bracket that is inside the box onto the side of the air conditioner and then screw the two openings on the bottom bracket into the windowsill?

A. Yes.

Q. And you're supposed to do that on both sides of the air conditioner in order that the air conditioner is secured to the windowsill.

A. Correct.

Q. Did you do that?

A. No.

. . . .

Q. So based on the fact you're putting it into a sliding window that's configured the way it is, even if you wanted to follow these instructions, you couldn't have?

A. Correct.

. . . .

Q. . . . Would you agree that the installation instructions tell us the following three things? That this air conditioner should be installed only in a double-hung window?

A. Yes.

Q. That the air conditioner should be affixed to the sill of the double-hung window with brackets and screws on both sides?

7

A.    Yes.
Q.    And that the top of the air conditioner should be secured with a window lock bracket and screw into the upper window sash?
A.    Yes.
Q.    And would you agree that you did not follow any of those instructions or requirements?
A.    Yes.
    . . . .
Q.    When you opened this box, did you realize that there was no instruction or owner's manual inside the box?
A.    Yes.
Q.    Did you call Wal-Mart about that?
A.    No.
Q.    Why not?
A.    Because I needed the unit, and I didn't feel that it was going to make a difference, and I wasn't going to return the unit because I knew there wasn't another one.[8]

Strout filed a response to the summary judgment motions of McGee and Ply Gem and a combined response to Haier and Wal-Mart. Strout submitted the declaration of architect and building inspector Stan Mitchell in opposition to the motions for summary judgment. In his declaration, Mitchell incorporates "fully by . . . reference" a 29-page "Inspection Report." The Inspection Report addresses the construction of the building, the bedroom and window configuration, safety hazards, and concerns. Mitchell concluded, "Each of the four Defendant[s'] acts or omissions contributed to causing Ms. Strout's injury. Had any of these acts or omissions been absent, Ms. Strout's injury would likely had been prevented."

Mitchell testified the low 24 ½-inch sill height of the window was "extremely dangerous" and "hazardous" and did not meet the 1976 "Uniform Building Code" (UBC) standards.

Going back decades (e.g., UBC 1964 version) minimum building code has required guards (guardrailing) where the elevation from the floor down to adjacent surfaces exceeds certain heights (e.g., UBC 1976 at a maximum

---

[8] Boldface omitted.

8

30-inch height). Code stipulates a minimum guardrail height of 36 inches in single-family residences. At 24 ½ inches the subject window sill height does not comply with the code-minimum of 36 inches. The subject window sill is about 70% of the height required by code. Also, the 2-foot sill height is well below an adult's center of gravity (as well as inherently hazardous for children). (See related points in Background section regarding codes and a person's center of gravity).

Further, the subject low (2-foot) window sill height is non-standard (does not comply with industry standards), especially for a second floor window over exterior concrete paving (patio).

The low (2 feet) window sill height is extremely dangerous in terms of a building occupant inadvertently backing into the window if open (including when screens are installed). Similarly, even with the window closed, both of the window panes would be vulnerable in certain scenarios if a building occupant was to fall into the window.[9]

Mitchell states the owner of the building is "responsible for the maintenance of buildings and structures."

Building Code states: all buildings as structures, both existing and new and all parts thereof shall be maintained in a safe and sanitary condition. All devices or safeguards which are required by this code shall be maintained in conformance with the code edition under which it was installed.

Mitchell states the UBC required the owner of the building to install "guards on 'unenclosed floor and roof openings, open and glazed sides of landings or ramps, balconies or porches, which are more than 30 inches above grade.' " In his opinion, the low window sill required McGee to install guards on the sliding glass window:

[G]uardrails not less than 42 inches in height on the subject window. This section has been, in practice within the industry, applied to low window sills situations as well as the described landings, ramps, balconies or porches specifically described in § 1716. This was the industry standard at the time the premises were originally built in 1979-1981, because low window sills, such as in the Strout premises, presented the same risk of falling as an unenclosed side of a landing or ramp.

---

[9] Emphasis in original.

Mitchell states:

The low window sill of 24-9/16 inches at the subject premises after the window was installed had a window opening tall and wide enough for an adult person to fall through. This was an extremely dangerous condition jeopardizing the safety of its occupants.

Mitchell identified a number of other building defects, including "inadequate roof framing venting" and insulation. Mitchell testified that under the UBC, McGee was responsible for the maintenance of the building.

Mitchell identifies the following safety hazards and defects that contributed to the accident:

1.    NO INSTALLATION INSTRUCTIONS: The lack of installation instructions is one of the main defects and factors relating to the subject incident. This is primarily because the instructions contained a statement that the subject air conditioning unit was to be installed only in double-hung windows. . . .

2.    MISSING PARTS: That the packaged air conditioner was also missing parts also contributed to Ms. Strout's incident. . . .

3.    PRODUCT QUALITY AND RETURNS: I would anticipate the subject air conditioner's quality was also a factor in the incident. Low-quality products inevitably lead to product returns after the box is opened . . . . Returns also risk the compromise of product packaging designed to protect the integrity of its contents. The air conditioning unit Ms. Strout and Mr. Lang purchased came in a box that had been apparently "cannibalized" and taped back together. . . .

4.    WINDOW SILL HEIGHT: The inappropriate low window sill height also was a major defect and factor contributing to the incident. Had the subject window sill met (or exceeded) the code-required minimum height of 36 inches it would have provided an effective barrier for prevention of a building occupant such as Ms. Strout from falling through the window. In addition to code, the sill height also does not comply with standards. During ABI's[10] (numerous) home inspection evaluations, we rarely observe a floor-to-window sill height of 2 feet, especially when there is underlying concrete paving. I would anticipate the frequency of encountering second

---

[10] Architectural Building Inspection Incorporated.

floor window sills in a single-family residence at 2 feet is less than 1%, and at 2.5 feet less than 10%. . . .

5.    ROOF VENTILATION:  One of the primary reasons Ms. Strout and her family were exposed to significant solar heat gain living in the subject building during the summer months is that the building had very poor roof ventilation that did not comply with code. . . .

6.    MARGINAL ROOF OVERHANG:  In addition to the point about roof ventilation, the marginal roof overhang at the west side of the subject building also contributed to heat gain and the desire for air conditioning.

7.    VIBRATIONS:  Building and building component vibrations also would have been a factor in Ms. Strout's incident in terms of loosening the subject air conditioning unit. . . .

8.    LIGHTING/CONTRAST:  The lighting/contrast in the subject bedroom between the window area and the exterior was also a contributing factor. . . .

9.    EGRESS WINDOW:  There was no mention in the Haier installation instructions of maintaining a code-required egress window when installing the air conditioner.  The subject window was the code-required egress window for the bedroom.

Mitchell addresses the improper installation of the air conditioner unit:

At the time of Ms. Strout's incident the subject air conditioner was improperly installed and secured to the window.  The missing installation instructions along with the missing parts and information regarding the type of window that this equipment should be installed in, resulted in its installation i[n] an inappropriate type of window.  The subject window was not only the wrong type (horizontal sliding instead [of] the recommended single hung) but it is also in itself a hazardous window by having a low sill height, further increasing the risk of a fall.

In the "Other Points" section of his report, Mitchell notes the window frame created a "false sense of security":

The subject window is physically narrow, and when its slider is open the resultant opening is also very narrow.  Further, the window frame itself has a center sash frame that overlaps.  This size and configuration create a false sense of security.  That is, someone approaching the window with

the installed air conditioner would not anticipate the possibility s/he could fall out of such a small narrow space that is set off the floor.

Mitchell concluded: "Multiple non-standard aspects affecting building installations and facilities represent a significant safety risk, and contribute to a building occupant's distraction and vulnerability to personal injury." According to Mitchell, "Obviously, due to a lack of instructions and missing parts, the subject air conditioner was installed in an inappropriate location, and in an incomplete manner, compromising its stability." Mitchell states, "Stability was further compromised due to vibrations from various external forces, and the air conditioner's own operation." Mitchell states that "factors such as adverse lighting contrast conditions and the subject window's sill height inhibited her ability to see the unit properly and maintain her position inside the bedroom after taking hold of the unit." Mitchell concluded, "The combination of these defects and discrepancies led to Ms. Strout's injury. If any one of them had been eliminated or remedied, her incident likely would not have occurred."

In response to McGee's motion for summary judgment, Strout argued the testimony of Mitchell established McGee was liable for the low window sill that violated the UBC and created "an extremely dangerous" safety hazard. Strout cited the defective building conditions "noted by" Mitchell, including the "lower window sill through which Ms. Strout fell [that] was 24-9/16 inches high" and violates several building and property maintenance codes; the inadequate insulation and venting; the window opening that "created a deceptively narrow window opening appearance"—"[t]he height of the window, 4 feet 8 inches (4'8" or 56"), necessitates the low window sill opening. The window as manufactured could not have been installed in the premises with a sill any higher than the one utilized"; the roof eave above the window was not large enough

to provide adequate shade to the window; and the concrete patio McGee installed increased the danger from a fall.

Strout argued Mitchell's testimony established that McGee violated the UBC by not installing guards on the window:

> Architect Stan Mitchell has testified that Ms. McGee breached her statutory duties of maintenance on the premises and the breach of these duties was a proximate cause of Ms. Strout's injuries. Mr. Mitchell states that had the required guards been installed on the window Ms. Strout's injury would have been prevented.[11]

In response to Ply Gem's motion for summary judgment, Strout argued Mitchell's testimony established design defect and the failure to warn under both the risk-utility test and the consumer expectations test.

Mitchell states Ply Gem "should have . . . either created a design that utilized guards, which would prevent falls at the code required 42 inches above the floor," or "could have designed the window with an opening through which a person could not fall when opened. The cost of the guards would have been minimal. In my report I estimated the cost at approximately $100 to $300."

Strout argued whether the danger was open and obvious was a material issue of fact. Strout cited Mitchell's testimony that because of "the danger of a window installed with a low window sill," Ply Gem "should have warned Ms. Strout and others similarly situated about the danger windows such as this present to building occupants. Ply Gem could have recalled the window and installed guards." Mitchell also addressed the failure of Ply Gem to warn:

> [W]arnings about the deceptive appearance of the window and the fall hazards that the subject Ply Gem window presented when installed with a

---

[11] Footnote omitted.

low sill should have been provided when the window was originally installed on the premises.

Ply Gem moved to strike Mitchell's "opinions about window design and warnings" as outside his area of expertise.

In opposition to the motions of Haier and Wal-Mart, Strout submitted the declaration of certified industrial hygienist Michelle Copeland and retail store operations expert Alex Balian. Copeland testified that the Haier "literature and graphics" do not adequately warn consumers about the danger of installing the air conditioner "in windows other than double hung windows" and "do not meet current standards." Copeland testified neither the Haier shipping box nor the Quick Start Guide included any prohibition against using the air conditioner unit in another type of window. Copeland testified that the statement in the User and Care Guide that the unit "can only be installed in a double hung window" is not highlighted or "emphasized" as a safety precaution. Balian testified that a retailer must inspect returned merchandise to ensure "all manufacturer intended product, documents and parts" are included.

Strout argued that because Lang did not have the Haier User and Care Guide, his testimony was speculative. Strout cited the testimony of Lang and her testimony to argue there were material issues of fact on proximate cause. Lang and Strout testified they would have read and followed the instructions in the Haier User and Care Guide.

The court denied the summary judgment motion to dismiss the claims against McGee in part. The court denied Haier's motion to dismiss the WPLA claims. The court cited the testimony of Copeland that Haier should have placed warnings on the air conditioner unit. The court granted Wal-Mart's motion for summary judgment dismissal. The court ruled Wal-Mart was not a "manufacturer" under the WPLA. The court ruled

Strout could not establish proximate cause. The court cites the testimony of Strout that she "didn't play any role in checking out how to properly install the air conditioner or where it was supposed to be placed in terms of the type of window it should be placed in" and "relied exclusively on Rob Lang to properly install the air conditioner into the sliding window" and the testimony of Mitchell that the missing parts "probably didn't contribute to this incident."[12]

The court granted Ply Gem's motion to strike Mitchell's testimony on consumer expectations and warnings and granted Ply Gem's summary judgment motion to dismiss the WPLA claims.

Strout filed a motion for reconsideration. Strout submitted additional declarations and deposition designations. The court ruled Strout "could have submitted this evidence" previously but "chose not to." The court denied the motion for reconsideration. McGee and Haier entered into a settlement agreement with Strout. McGee and Haier stipulated to an order of dismissal. The court entered an order dismissing the claims against McGee and Haier with prejudice.

## ANALYSIS

Strout contends the court erred by dismissing the WPLA claims against Wal-Mart and Ply Gem on summary judgment.

### Standard of Review

We review the court's decision on summary judgment de novo, performing the same inquiry as the trial court. Kruse v. Hemp, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993); Nichols v. Peterson Nw., Inc., 197 Wn. App. 491, 498, 389 P.3d 617 (2016). We view all facts and reasonable inferences drawn from those facts in the light most

---

[12] Boldface omitted.

15

favorable to the nonmoving party. Young v. Key Pharm. Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989). Summary judgment is appropriate if the pleadings, affidavits, depositions, and admissions demonstrate the absence of any genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300-01, 45 P.3d 1068 (2002); Kofmehl v. Baseline Lake, LLC, 177 Wn.2d 584, 594, 305 P.3d 230 (2013).

When the defendant files a motion for summary judgment showing the " 'absence of evidence to support the [plaintiff]'s case,' " the burden shifts to the plaintiff to set forth specific facts showing a genuine issue of material fact for trial. Young, 112 Wn.2d at 225 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)); Walston v. Boeing Co., 181 Wn.2d 391, 395-96, 334 P.3d 519 (2014). Bare assertions that a genuine material issue exists cannot defeat a motion for summary judgment. SentinelC3, Inc. v. Hunt, 181 Wn.2d 127, 140, 331 P.3d 40 (2014). Allegations or conclusory statements of fact unsupported by evidence are not sufficient to establish a genuine issue of material fact. Baldwin v. Sisters of Providence in Wash., Inc., 112 Wn.2d 127, 132, 769 P.2d 298 (1989); Griswold v. Kilpatrick, 107 Wn. App. 757, 761-62, 27 P.3d 246 (2001); Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 169, 273 P.3d 965 (2012). A party must present more than "[u]ltimate facts" or conclusory statements. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988), abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 404 P.3d 464 (2017). The nonmoving party cannot rely on "speculation, argumentative assertions that unresolved factual issues remain, or

in having its affidavits considered at face value." <u>Seven Gables Corp. v. MGM/UA Entm't Co.</u>, 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

<u>WPLA</u>

The WPLA is the exclusive remedy for product liability claims in Washington. <u>Wash. Water Power Co. v. Graybar Elec. Co.</u>, 112 Wn.2d 847, 853, 774 P.2d 1199 (1989). The WPLA creates a cause of action for product-related harms. <u>Stanton v. Bayliner Marine Corp.</u>, 123 Wn.2d 64, 71, 866 P.2d 15 (1993); <u>Wash. Physicians Ins. Exch. & Ass'n v. Fisons Corp.</u>, 122 Wn.2d 299, 322, 858 P.2d 1054 (1993). The WPLA imposes liability on a product manufacturer for the harm proximately caused by a product that was not reasonably safe as designed or because adequate warnings or instructions were not provided. RCW 7.72.030(1). RCW 7.72.030(1) states, in pertinent part:

> A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided.
>
> (a) A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product: PROVIDED, That a firearm or ammunition shall not be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged.
>
> (b) A product is not reasonably safe because adequate warnings or instructions were not provided with the product, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate.

Although RCW 7.72.030(1) uses the term "negligence," the strict liability applies to a design defect claim or a failure to warn claim under RCW 7.72.030(1)(a) or (b). Ayers v. Johnson & Johnson Baby Prods. Co., 117 Wn.2d 747, 765, 818 P.2d 1337 (1991); Soproni v. Polygon Apt. Partners, 137 Wn.2d 319, 326-27, 971 P.2d 500 (1999) (citing Falk v. Keene Corp., 113 Wn.2d 645, 782 P.2d 974 (1989)).[13]

The WPLA also imposes liability on a product manufacturer for implied warranty of merchantability under Title 62A RCW. RCW 7.72.030(2) states:

> A product manufacturer is subject to strict liability to a claimant if the claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction or not reasonably safe because it did not conform to the manufacturer's express warranty or to the implied warranties under Title 62A RCW.

Wal-Mart

Strout contends the court erred by granting summary judgment dismissal of her WPLA claims against Wal-Mart as a manufacturer under RCW 7.72.030 for design defect, failure to warn, and breach of implied warranty. Strout asserts Wal-Mart is strictly liable for "selling a defectively remanufactured product that did not include Haier's instructions, warnings, and installation parts."[14]

Under the WPLA, a "manufacturer" includes a product seller who "produces, makes, fabricates, constructs, or remanufactures" the product for sale. RCW 7.72.010(2). RCW 7.72.010(2) states:

> "Manufacturer" includes a product seller who designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer. The term also includes a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer.

---

[13] However, for failure to warn claims involving a danger that becomes known after manufacture, a negligence standard is applied. Ayers, 117 Wn.2d at 765.

[14] Emphasis in original.

18

A product seller acting primarily as a wholesaler, distributor, or retailer of a product may be a "manufacturer" but only to the extent that it designs, produces, makes, fabricates, constructs, or remanufactures the product for its sale. A product seller who performs minor assembly of a product in accordance with the instructions of the manufacturer shall not be deemed a manufacturer. A product seller that did not participate in the design of a product and that constructed the product in accordance with the design specifications of the claimant or another product seller shall not be deemed a manufacturer for the purposes of RCW 7.72.030(1)(a).

Statutory construction is a question of law we review de novo. Bostain v. Food Express, Inc., 159 Wn.2d 700, 708, 153 P.3d 846 (2007). Our primary goal is to determine legislative intent. Bostain, 159 Wn.2d at 708. In determining legislative intent, we consider the text and the plain and ordinary meaning of the language used as the expression of the intent of the legislature. Bostain, 159 Wn.2d at 708.

In Washburn v. Beatt Equipment Co., 120 Wn.2d 246, 259, 840 P.2d 860 (1992), the Washington Supreme Court cites dictionary definitions to define the terms "produce," "make," "fabricate," and "construct" as used in RCW 7.72.010(2).

"Produce" includes "to give being, form, or shape to" and "to make economically valuable". ([Emphasis] ours.) Webster's Third New International Dictionary 1810 (1981). To "make" includes "to bring (a material thing) into being by forming, shaping, or altering material"; "to lay out and construct", and "to put together from components or ingredients". ([Emphasis] ours.) Webster's, at 1363. To "fabricate" means "to form into a whole by uniting parts" and "to build up into a whole by uniting interchangeable standardized parts". ([Emphasis] ours.) Webster's, at 811. To "construct" includes "to form, make, or create by combining parts or elements". Webster's, at 489.[15]

Washburn, 120 Wn.2d at 259. The dictionary defines "remanufacture" as "to manufacture (used or scrap material) into a new product." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1919 (2002).

---

[15] Emphasis in original.

19

Strout cites Washburn to assert "repackaging" the Haier air conditioner without the necessary parts or User and Care Guide made Wal-Mart a "remanufacturer." In Washburn, Beatt Equipment Company contracted to construct and install a pipeline system. Washburn, 120 Wn.2d at 252-53. Beatt argued it was a product seller not a manufacturer. The evidence established the "prime contract for which [Beatt] was a subcontractor was not for individual parts, but for a system." Washburn, 120 Wn.2d at 259.[16] The court concluded the evidence supported finding Beatt was a manufacturer because it "ma[d]e, fabricate[d] and construct[ed] a pipeline system" where Beatt had to "complete the manufacturing process" by cleaning, stripping, and joining pieces of pipe. Washburn, 120 Wn.2d at 259-60.[17]

Viewing the evidence in the light most favorable to Strout, the record shows that after the Haier air conditioner unit was returned, Wal-Mart repackaged and taped the Haier box closed and the box did not contain the User and Care Guide or all the parts necessary for installation. Unlike Washburn, there is no evidence that Wal-Mart designed, produced, made, fabricated, altered, or constructed the Haier air conditioner or any of its component parts. Like "produce," "make," "fabricate," and "construct," remanufacturing requires making a new product.[18]

---

[16] Emphasis in original.

[17] Emphasis in original.

[18] In a statement of additional authorities, Strout cites Rublee v. Carrier Corp., 192 Wn.2d 190, 428 P.3d 1207 (2018). In Rublee, the Washington Supreme Court adopted the "apparent manufacturer" doctrine: "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Rublee, 192 Wn.2d at 201-02; RESTATEMENT (SECOND) OF TORTS § 400 (AM. LAW INST. 1965). The court states the "two predominant ways a nonmanufacturing entity puts out a chattel as its own product" are "(1) the entity appears to be the manufacturer of the product or (2) the product appears to have been made for the particular entity." Rublee, 192 Wn.2d at 199 (citing RESTATEMENT § 400 cmt. d). There is no evidence in the record that Wal-Mart appears to be the manufacturer or that the air conditioner was made particularly for Wal-Mart.

We conclude Wal-Mart is not a manufacturer under the WPLA and the court did not err by dismissing the claims for design defect, failure to warn, or breach of implied warranty under RCW 7.72.030.

In the alternative, Strout contends the court erred in dismissing her claim against Wal-Mart for negligence as a product seller under RCW 7.72.040. RCW 7.72.040(1)(a) states, "[A] product seller other than a manufacturer is liable to the claimant only if the claimant's harm was proximately caused by" the product seller's "negligence."

"As a general rule, manufacturers of defective products are held to a higher standard of liability, including strict liability where injury is caused by a manufacturing defect or a breach of warranty." Johnson v. Recreational Equip., Inc., 159 Wn. App. 939, 946, 247 P.3d 18 (2011) (citing RCW 7.72.030(2)). By contrast, a product seller that does not make, fabricate, construct, or remanufacture a product is "liable only for negligence, breach of express warranty, or intentional misrepresentation." Johnson, 159 Wn. App. at 946-47.

Strout argues Wal-Mart's negligence was a proximate cause of the harm. Strout asserts Wal-Mart was negligent in failing to "make an inspection of the product prior to sale" and breached its "duty to inspect customer returned merchandise to ensure that all Haier's intended to be enclosed product, written documents, and parts were in fact contained within undamaged packaging prior to reshelving the product for resale."

Viewed in the light most favorable to Strout, the evidence supports finding Wal-Mart negligently repackaged and sold the returned Haier air conditioner. Strout and Lang testified that the box looked like it had "been opened" and "taped shut again." Strout said the box "wasn't shut like . . . normal" and "look[ed] like it had been opened

21

and repacked or resealed." Retail store operations expert Balian testified that Wal-Mart had a duty to check returned merchandise to "ensure the product, its attachments, packaging and parts are complete and undamaged," and Wal-Mart's return policy did "not meet the standard of acceptable practices in the retail industry."[19]

Strout also contends material issues of fact on proximate cause preclude summary judgment. Strout argues the deposition testimony of Lang and Strout creates a material issue of fact as to whether Lang and Strout would have followed instructions in the User and Care Guide had they been provided. Wal-Mart contends there is no evidence the missing hardware was a proximate cause and Lang's testimony shows he would have installed the air conditioner in the sliding window even if the User and Care Guide was in the box.

Viewing the evidence in the light most favorable to Strout, there are material issues of fact on proximate cause. Lang testified the Haier box did not contain all the parts necessary to install the air conditioner and the User and Care guide was not in the box. Mitchell's testimony that the missing hardware for installation of the air conditioner in a double-hung window "probably didn't contribute to this incident" is speculative and equivocal. Lang testified he would have followed the instructions if the User and Care Guide had been in the box:

> Q.    So if there had been this use and care guide inside the box, would you have read it to ensure that you knew how to safely and properly install this air conditioner?
> A.    Yes.
> Q.    And would you have followed these instructions?

[19] Strout also claims Wal-Mart breached the agreement with Haier that required Wal-Mart "to send any returned item back to the original manufacturer." Although the record shows Wal-Mart may send returned merchandise back to Haier, there is no specific contract provision that requires Wal-Mart to do so.

22

A. Yes.[20]

Strout testified that if she had the User and Care Guide, she "probably" would have told Lang, " 'You better not install it in the sliding window, because this is designed only for a double-hung window.' "

We reverse summary judgment dismissal of the claim against Wal-Mart for negligence as a product seller under RCW 7.72.040.[21]

Ply Gem

Strout challenges the trial court's decision to grant the motion of Ply Gem to strike in-part the testimony of Mitchell and dismissal of the WPLA claims under RCW 7.72.030. Strout contends the expert testimony of architect and building inspector Mitchell creates material issues of fact as to whether Ply Gem is liable for defective design and failure to warn under the WPLA.

Expert Testimony

Ply Gem moved to strike Mitchell's testimony on defective design and warnings. Ply Gem cited Mitchell's deposition testimony that he is "not a window manufacturing industry standard expert," that he had never "seen any warning on a window before," and that he was not providing an opinion on warnings. The court concluded Mitchell "offers several opinions that are outside his area of expertise."

> The declaration of Stan Mitchell, an architect and a building inspector, is the primary evidence that Plaintiff Valerie Strout offers in support of her claims against Ply Gem. But the Court finds that Mitchell offers several opinions that are outside his area of expertise. He opines about how a person would perceive the window opening in question,

---

[20] Boldface omitted.

[21] To the extent that Wal-Mart characterizes Lang's installation of the air conditioner unit as a superseding cause, this is an affirmative defense Wal-Mart must prove at trial. We note an intervening negligent act does not supersede Wal-Mart's negligence if reasonably foreseeable. Parkins v. Van Doren Sales, Inc., 45 Wn. App. 19, 27-29, 724 P.2d 389 (1986).

23

alleged defects in the window's design and construction, the need for warnings related to the window, what consumers expect regarding a window, and causation. Yet the evidence before the Court does not establish a foundation for Mitchell to offer these as expert opinions.[22]

Strout asserts the court erred by concluding several of Mitchell's opinions were outside his area of expertise and inadmissible. We review evidentiary rulings de novo when made in conjunction with a summary judgment motion. Wilkinson v. Chiwawa Cmtys. Ass'n, 180 Wn.2d 241, 249, 327 P.3d 614 (2014); Taylor v. Bell, 185 Wn. App. 270, 285, 340 P.3d 951 (2014).

The Rules of Evidence govern the admission of expert testimony. ER 702. "Generally, expert testimony is admissible if (1) the expert is qualified, (2) the expert relies on generally accepted theories in the scientific community, and (3) the testimony would be helpful to the trier of fact." Johnston-Forbes v. Matsunaga, 181 Wn.2d 346, 352, 333 P.3d 388 (2014). "A witness may qualify as an expert 'by knowledge, skill, experience, training, or education.' " L.M. v. Hamilton, 193 Wn.2d 113, 135, 436 P.3d 803 (2019) (quoting ER 702). ER 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

If requisite qualifications are established, any deficiencies in an expert's qualifications go to the weight, not the admissibility, of the testimony. O'Neill v. City of Port Orchard, 194 Wn. App. 759, 768, 375 P.3d 709 (2016). However, " '[a]n expert may not testify about information outside his area of expertise.' " L.M., 193 Wn.2d at 135 (quoting In re Marriage of Katare, 175 Wn.2d 23, 38, 283 P.3d 546 (2012)).

---

[22] Footnotes omitted.

24

Mitchell unequivocally testified he has never "seen any warning on a window before" and was not "providing opinions as to this case on what type of — as to whether there should be warnings on the windows." Based on Mitchell's testimony, the court did not err in concluding his opinions about warnings Ply Gem should have provided were inadmissible.

However, the court erred in concluding Mitchell was not qualified to testify as an architect about design defects, the consumer expectations and risk-utility tests, and the safety hazards created by installation of the Ply Gem window in the second floor bedroom. Mitchell has a master's degree in architecture and is a state licensed home inspector. Mitchell owns Architectural Building Inspection Incorporated, "a professional consulting service that provides pre-purchase building inspections of residential and commercial buildings, feasibility analyses, troubleshooting building problems, [and] expert witness testimony." Mitchell "practiced as an architect for over 39 ½ years" and has been "in the building construction industry for 57 years." Mitchell has "inspected approximately 15,000 buildings while operating ABI" and "approximately 10,000 buildings while in the Army Corp. of Engineers." Mitchell has "evaluate[d] the circumstances and causes of injuries occurring to people in or around buildings" and provided expert testimony in "over 300 superior court cases locally and nationally."

Design Defect and Warnings

Stout relies on Mitchell's testimony to argue the court erred in dismissing the WPLA claims against Ply Gem for design defect and the failure to warn. Mitchell's testimony and report do not create a material issue of fact or support the conclusion that Ply Gem is liable under the WPLA for design defect of the sliding glass window or

failure to warn purchasers that installing the sliding glass window in a second floor opening with a low sill that violates the UBC is a safety hazard that requires use of guards.

A plaintiff may establish liability under the WPLA for design defect or failure to warn claims by using either a risk-utility test or a consumer expectations test. Falk, 113 Wn.2d at 645 (design defect claim); Ayers, 117 Wn.2d at 747 (failure to warn claim). Under the WPLA, a plaintiff must show (1) the manufacturer's product (2) was not reasonably safe because of its design or lack of adequate warnings or instructions which (3) proximately caused the harm to the plaintiff. See Ayers, 117 Wn.2d at 752.

Below, Strout relied on Mitchell to argue the window was not reasonably safe as designed under the consumer expectations and risk-utility tests. On appeal, Strout relies solely on the consumer expectations test.

The consumer expectations test requires the plaintiff to show "the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer." RCW 7.72.030(3); Falk, 113 Wn.2d at 654.

> "In determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk may be relevant in a particular case. In other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue."

Falk, 113 Wn.2d at 649 (quoting Seattle-First Nat'l Bank v. Tabert, 86 Wn.2d 145, 154, 542 P.2d 774 (1975)). Under RCW 7.72.030(3), a plaintiff may show the product was "unsafe to an extent beyond that which would be contemplated by the ordinary consumer."

"The ultimate issue in a strict liability claim is whether the product is in a defective condition unreasonably dangerous to the user, at the time the product leaves the seller's hands." Davis v. Globe Mach. Mfg. Co., 102 Wn.2d 68, 74, 684 P.2d 692 (1984).[23] The expectations of the consumer "are judged against the reasonable expectations of the ordinary consumer." Soproni, 137 Wn.2d at 327.

Strout cites Soproni and Mitchell's testimony to argue a consumer would "not appreciate the risk of Ply Gem's window design." In Soproni, a 20-month-year-old child fell out of a second-story "pop-out" window. Soproni, 137 Wn.2d at 322. The window "was secured by a 'detent mechanism' or 'drop bolt' which was designed to drop vertically by gravity into a slot into the window track when the window was closed or at a three-inch opening." Soproni, 137 Wn.2d at 322. But the window could be opened "with minimal effort" and did not "have a locking device for the detent." Soproni, 137 Wn.2d at 322. The plaintiffs argued the window was unreasonably dangerous at the time of manufacture to an extent beyond which would be contemplated by the ordinary consumer because "the detent mechanism could be easily manipulated by an infant and . . . the window was not safe without a device to deter or prevent a small child from opening it." Soproni, 137 Wn.2d at 323-24.

Unlike in Soproni, there is no evidence Ply Gem defectively designed the sliding glass window. The sliding glass window is 4 feet 8 ¼ inches tall and 3 feet 10 inches wide. The left windowpane is fixed. Ply Gem designed the window with two locking devices. A "cam lock" or lock-and-key device keeps the sliding sash "in a fully closed position to prevent anyone from opening it from the outside." The cam lock can also "prevent children from opening it from the inside." The second locking device on the

---

[23] Emphasis in original.

window is a "sash stop" that allows the sliding "sash to be opened only two to three inches, at which point a plunger can be pushed into" the opening to prevent the window from opening more than three inches.

Strout cites Mitchell's testimony that the window opening was "deceptively narrow" and "[t]he window's size and configuration create a false sense of security." In his declaration, Mitchell states:

> [T]he Ply Gem manufactured window through which Ms. Strout fell is physically narrow and, when its sliding sash is open, the resultant opening appears to be deceptively narrow. The window's size and configuration create a false sense of security. Someone approaching the window would not anticipate the possibility (s)he could fall out of what appears to be a small and narrow appearing space. A person approaching the window would have the tendency to let his or her guard down.

Mitchell testified that "common sense would tell a reasonable person if they got their center of gravity over the window sill, they'd fall out." Mitchell said, "[M]ost people would understand that. . . . They might not get the center of gravity thing but would get it at a certain point that they're going to fall out." Mitchell testified that the "2-foot sill height is well below an adult's center of gravity."[24] In July 2014, Strout was 5 feet 11 inches tall and weighed approximately 220 pounds. The sill of the window was at approximately Strout's knee. Mitchell testified, "The low window sill of 24-9/16 inches at the subject premises after the window was installed had a window opening tall and wide enough for an adult person to fall through."

The crux of Mitchell's testimony is that the size and configuration of the window opening and the low window sill that does not meet the code requirements creates the

---

[24] Emphasis omitted.

hazardous and dangerous condition, not the sliding glass window.[25] Mitchell does not testify that the Ply Gem window or the failure to warn violated the UBC. The uncontroverted record shows Ply Gem did not install the window and did not have a role in designing the window opening or determining the location or installation of the window in the second story of the townhouse.

Mitchell testified the architect and contractor designed and installed the low sill and window opening in the second story bedroom in violation of the UBC. The record shows the building was constructed between 1979 and 1981. In 1993, the building owner replaced the original window with a Ply Gem vinyl sliding-glass window. Ply Gem did not install the window in 1993. Mitchell testified that "builders, like architects, are tasked with constructing buildings to conform with code" and that the building owner must "maintain the buildings to comply with code."[26] Mitchell testified that "if you had a big space, a two-story space," the window "could have been installed with a sill at three feet and the header higher than doors." Mitchell testified, "[T]here's no problem with this window" if installed at ground level. In his report, Mitchell also notes the UBC requires "operable windows in sleeping spaces" have a minimum fire egress of 20 inches. The 20 ¾-inch width of the window opening meets the minimum fire egress requirements of 20 inches.

---

[25] We note Mitchell testified about safety hazards and "feasibly safe [window] alternatives" in Soproni. See Soproni, 137 Wn.2d at 324.

[26] The construction statute of repose bars construction claims of "any improvement upon real property" that has not accrued within six years after substantial completion. RCW 4.16.300, .310; Puente v. Res. Conserv. Co. Int'l, 5 Wn. App. 2d 800, 808, 428 P.3d 415 (2018).

Mitchell testified that because a low sill height is a hazard, Ply Gem should have warned about the risk and provided a guard.[27] However, Mitchell testified, "In a conventional scenario with a standard eight foot floor to ceiling configuration, this window never should have been designed, manufactured and installed in a conventional floor to ceiling height."

The designated Ply Gem witness, warranty and service manager Bryan Doyea, testified, "We typically don't know where our windows are going. They can go anywhere. It's up to the installer or the architect or the builder to determine what window configurations go where." Doyea also testified that because the design and placement of the window is the responsibility of the architect and contractor, Ply Gem cannot "warn against everything or understand exactly every kind of parameter that we would have to warn against in terms of where our windows go."

Strout also argues there is a question of fact whether Ply Gem is liable for the failure "to warn users of its windows regarding the risk of falling from them, particularly if consumers foreseeably misapplied air conditioner units in them." Foreseeability is not an element of a failure to warn claim under RCW 7.72.030(1)(b). Ayers, 117 Wn.2d at 764.

---

[27] Mitchell testified about the cost of guards in the context of the risk-utility test. As previously noted, on appeal, Strout focuses solely on the consumer expectations test to argue liability under the WPLA.

We conclude the court did not err by granting summary judgment dismissal of the claim against Ply Gem for failure to warn.[28]

We affirm summary judgment dismissal of the WPLA claims against Ply Gem but reverse dismissal of the WPLA claim against Wal-Mart as a product seller under RCW 7.72.040 and remand for trial.

WE CONCUR:

---

[28] For the first time at oral argument, Strout cited Taylor v. Intuitive Surgical, Inc., 187 Wn.2d 743, 389 P.3d 517 (2017), to argue Ply Gem breached the duty to warn the purchaser of the window about the danger of installing the window on the second floor with a low sill. Taylor is inapposite. In Taylor, the Washington Supreme Court held the WPLA requires manufacturers to warn hospitals about their "dangerous medical devices." Taylor, 187 Wn.2d at 747-48. The court concluded that "where the product is an extremely complex and inherently dangerous medical device, it is logical that hospitals would need warnings" because "hospitals have an independent duty of care to their patients." Taylor, 187 Wn.2d at 755.